**JACKSON, et al., Plaintiff,**

v.

**FAUVER, et al., Defendant(s).**

**No. CIV.98–2890 WGB.**

United States District Court, D. New Jersey.

Sept. 27, 2004.

700

Robert J. Kipnees, Esq., Emily Kaller, Esq., Kellie Lavery, Esq., Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP, Metro Corporate Campus One, Dar-

ren M. Gelber, Esq., John Hogan, Esq., Ellen Torregrossa–O'Connor, Blair Zwillman, Wilentz, Goldman & Spitzer, A Professional Corporation, Woodbridge, NJ, for Plaintiff.

Stephen D. Holtzman, Esq., Jeffrey S. McClain, Esq., Holtzman & McClain, P.C., A Professional Corporation, Linwood, Robert C. Doherty, Office of the New Jersey Attorney General, R.J. Hughes Justice Complex, Trenton, NJ, for Defendants.

### OPINION

BASSLER, District Judge.

Plaintiffs, 15 former and current inmates at East Jersey State Prison ("EJSP"), brought separate actions against Correctional Medical Services and four of its officials, and against officials and employees of the New Jersey Department of Corrections (collectively "Defendants"). Plaintiffs argue that Defendants were deliberately indifferent to Plaintiffs' serious medical needs, in violation of Plaintiffs' constitutional rights under the Eighth Amendment. All Plaintiffs also brought medical malpractice claims against Defendants under New Jersey law.

Plaintiffs seek a judgment against Correctional Medical Services and its named employees, and an award of compensatory damages, punitive damages, litigation costs, and attorneys' fees. Plaintiffs also seek to enjoin the Defendants from continuing the practices that allegedly violate EJSP inmates' constitutional rights. This Court has jurisdiction over Plaintiffs' constitutional and federal claims pursuant to 28 U.S.C. § 1331, and over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

Presently before this Court are Defendants' motions for summary judgment on Plaintiffs' federal and state law claims.

The parties have taken depositions and their experts have submitted reports. Defendants' motions for summary judgment are **granted** with regard to Plaintiffs Eugene Drinkard, Walter Griggs, Dennis Hanna, John Howard, Geraldo Izquierdo, Abdul Kahliq, Derrick Lewis, Thomas Musto and Isa Saalahudin. The pendent state law claims of these plaintiffs are **dismissed without prejudice.**

Defendants' motions for summary judgment with regard to Plaintiffs Gustavo Cancio, Stephen Castellano, Randolph Jackson, Mufeed Muhammad, Jerome Perkins and Paul Ratti are **granted in part** and **denied in part.**

### I. BACKGROUND

#### A. The Parties

##### a. Plaintiffs

Plaintiffs are 15 current and former inmates who at times material hereto were confined at EJSP, located in Rahway, New Jersey. Plaintiffs filed separate and individual 42 U.S.C. § 1983 and related state law actions against Defendants with regard to the medical treatment they received at EJSP. For the sake of the efficient resolution of these cases, this Court entertains the 15 separate complaints together. This case, however, is not a class action lawsuit. Thus, each individual action is treated independently.

##### b. Defendants

Seven of the defendants in this action were, at times material hereto, officials and employees of the Department of Corrections of the State of New Jersey ("DOC", collectively the "DOC Defendants"). The DOC Defendants are being sued in their individual and official capacities.[1]

---

1. Prior to the summary judgment hearing, the DOC Defendants submitted to the Court that they fully join the brief that was filed in behalf

of CMS and the CMS Defendants, and did not file a separate brief. At the hearing, the DOC Defendants again consented that they fully

Defendant William H. Fauver ("Fauver") was the Commissioner of the DOC. Defendant Howard L. Beyer ("Beyer") was the Assistant Commissioner of the DOC. Defendant Steven Pinchak ("Pinchak") was the Administrator of EJSP. Defendant Terry Moore ("Moore") was the associate Administrator of EJSP. Defendant Ronald Cathel ("Cathel") was an Assistant Superintendent of EJSP. Defendant Richard Switaj ("Switaj") was an Assistant Superintendent at EJSP.

Defendant Correctional Medical Services Inc. ("CMS") is a Missouri-based corporation. At all times relevant to this action, CMS provided medical services to inmates in DOC facilities, including EJSP, pursuant to a contract with the DOC (the "CMS–DOC contract"). The CMS–DOC contract became operative on April 27, 1996.

Four individuals who, at all times relevant to this action, were officials and employees of CMS are also defendants in this action (collectively the "CMS Defendants"). The CMS Defendants are being sued in their individual and official capacities.

Defendant Carol Holt ("Holt") was a manager of CMS. Defendant Bertha Robinson ("Robinson") was the Regional Administrator of CMS. Defendant James Neal ("Dr. Neal") was the Regional State Medical Director of CMS. Defendant Trevor Parks ("Dr. Parks") was CMS's Medical Director at EJSP.

Finally, Defendants John and Jane Does 1–10 are fictitious names of individuals who were agents of the DOC or CMS at all times relevant to this action. They are all being sued in their individual and official capacities.

## B. *General Material Facts*

Even though Plaintiffs do not bring a class action lawsuit, they all claim to be the victims of the same alleged general policies, adopted by CMS to increase profits while sacrificing the care and health of EJSP's inmates. Thus, the Court will summarize the general context from which these actions arise, and then outline the material facts of each individual action.

Plaintiffs allege that they were victims of profit enhancing policies practiced by CMS from the time it assumed responsibility for EJSP inmates' medical care, on April 27, 1996. Plaintiffs have provided this Court with several memoranda and reports written by Defendants Pinchak, Moore and Switaj throughout 1997 and the beginning of 1998. These documents, which were addressed to various DOC and CMS officials, detail failures and problems in the medical care that CMS provided to EJSP's inmates.

Generally, these documents suggest that from April 1996 to the beginning of 1998, Pinchak, Moore and Switaj accused CMS of: (1) failing to timely provide EJSP inmates with prescribed medication, (2) failing to provide EJSP inmates with prompt medical treatment and doctor visits (mostly due to lack of staffing), and (3) losing or misplacing inmates' medical records on numerous occasions. Also, an investigative report, authored by Defendant Moore on January 27, 1997, notes EJSP inmates'

join CMS and the CMS Defendants. They also suggested, however, that *Durmer v. O'Carroll*, 991 F.2d 64 (1993), instructs that the DOC Defendants should be granted summary judgment, regardless of this Court's Holding on CMS and the CMS Defendants' motion. The Court rejects this untimely claim. While *O'Carroll* may or may not apply

to the actions at bar, the DOC Defendants' repeatedly submitted that they fully join CMS and the CMS Defendants, and failed to file a brief describing how *O'Carroll* is applicable here. In denying this argument, the Court take notice of the fact that **Plaintiffs seek no damages from the State or the DOC Defendants.**

frustration with CMS's medical services and the general feeling among these inmates that CMS does not care about the medical treatment it provides them.

While Defendants correctly point out that none of the Plaintiffs are mentioned by name in these general reports, this Court finds that these general memoranda and reports are relevant for this Court's understanding of the general medical treatment that was provided to EJSP inmates during at least part of the time period that Plaintiffs' actions address. The Court will now address the material facts in each of the individual claims.

## II. PLAINTIFFS' EIGHTH AMENDMENT CLAIMS

At the core of this litigation are Plaintiffs' § 1983 actions, alleging that Defendants' have violated Plaintiffs' rights under the Eighth Amendment. These federal law claims also set the basis for this Court's jurisdiction. Thus, the Court will initially determine whether Plaintiffs' Eighth Amendment claims survive Defendants' summary judgment challenge.

### a. Genuine Issues of Material Fact

Summary judgment is appropriate only if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). The applicable substantive law determines whether or not a fact is material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. 2505 (citation omitted). In determining whether a genuine issue of material fact exists, all inferences must be drawn, and all doubts must

be resolved, in favor of the non-moving party. Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302, 305–306 (3d Cir. 2001) (citing Anderson, 477 U.S. at 248, 106 S.Ct. 2505). The moving party has the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this requirement, the burden shifts to the non-moving party to present evidence that there is a genuine issue for trial. Id. at 324., 106 S.Ct. 2548

Defendants contend that summary judgment is proper because no genuine dispute of material fact exists in any of the actions before the Court. Defendants are wrong. Both parties rely on Plaintiffs' medical records and depositions to support their claims, and generally agree on the events that are documented in these sources. Looking at the same documents, however, the parties' experts reach opposite conclusions with regard to the quality of medical care provided to Plaintiffs.

Summary judgment is inappropriate if the parties dispute the inferences that could be reasonably drawn from the underlying facts. Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). Because the parties and their medical experts draw opposite inferences from many of the material facts in the cases at bar, the Court is satisfied that a genuine dispute over material facts does exist.

Defendants argue that the opinions of Plaintiffs' expert, Dr. Robert Greifinger ("Dr. Greifinger"),[2] on several matters are based on mistaken or wrong information, and thus cannot be viewed as reasonable inferences. Further, Defendants contend

2. Dr. Robert Greifinger is a pediatrician and the former Chief Medical Officer for the New York State Department of Corrections. He is a nationally recognized expert and consultant in field of health services in correctional facilities. His credentials are discussed in further detail below.

that Dr. Greifinger is not qualified to provide an expert opinion on many of the medical issues in question. As discussed in further detail below, this Court rejects Defendants argument with regard to Dr. Greifinger's qualifications. As to Defendants' argument with regard to mistaken information, courts are instructed not to determine the truthfulness or the credibility of factual issues at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### b. *Deliberate Indifference under the Eighth Amendment*

■ To establish a claim under § 1983, a plaintiff must show a violation of constitutional right or federal law, committed by an individual acting under the color of state law. *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 580–581 (3d Cir.2003). It is uncontested that CMS was acting under color of state law when it provided medical care to Plaintiffs. Because no federal laws are implicated by the actions of CMS's employees and agent, this Court must determine whether CMS employees and agents violated Plaintiffs' constitutional rights. *Id.*

### A. *Standard*

■ To establish a violation of his Eighth Amendment right to adequate medical care, an inmate "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicated deliberate indifference to that need." *Natale,* 318 F.3d at 582.

■ A serious medical need is a need diagnosed by a physician, that the physician believes to require medical treatment, or a need that is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987) (citation omitted); *see also Atkinson v. Taylor,* 316 F.3d 257, 273 (3d Cir.2003).

■ To demonstrate deliberate indifference, an inmate must show that the officials he is suing "knew of and disregarded an excessive risk to [the] inmate['s] health." *Natale,* 318 F.3d at 582 (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The Third Circuit has found deliberate indifference "in situations where 'necessary medical treatment is delayed for non-medical reasons.'" *Natale,* 318 F.3d at 582 (quoting *Monmouth County,* 834 F.2d at 347). Deliberate indifference has also been found "in situations where there was objective evidence that a plaintiff had serious need for medical care, and prison officials ignored that evidence." *Id.*

■ Finally, "only 'unnecessary and wanton infliction of pain' or 'deliberate indifference to the serious medical needs' of prisoners are sufficiently egregious to rise to the level of a constitutional violation." *Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir.2004) (quoting *White v. Napoleon,* 897 F.2d 103, 108–109 (3d Cir.1990)) (other citation omitted). "Allegations of medical malpractice are not sufficient to establish a Constitutional violation." *Id.* Also, "mere disagreement as to the proper medical treatment is also insufficient." *Id.* (citing *Monmouth County,* 834 F.2d at 346).

### B. *Analysis*

The fact that Defendants were aware of the medical problems about which Plaintiffs complained is uncontested. Thus, to determine that Plaintiffs' Eighth Amendment claims survive a motion for summary judgment, this Court must find that a reasonable jury could hold that: (1) Plaintiffs' medical problems were serious, and (2) Defendants were deliberately indifferent to these medical problems. This Court must determine these issues while looking

at the facts in the light most favorable to the Plaintiffs. *Hunt,* 526 U.S. at 552, 119 S.Ct. 1545.

The Court takes notice of the reports, written by Defendants' medical experts, that contradict or dispute many of Dr. Greifinger's findings, and that suggest that the medical treatment provided to Plaintiffs was proper. These reports constitute relevant evidence that supports Defendants' claims. It is also important to note, however, that a dispute between medical experts is an issue of fact that courts are generally encouraged not to decide on a motion for summary judgment. *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. 2505.

Defendants have presented documents to this Court which detail numerous doctor's appointments attended by Plaintiffs, and which contain a long list of treatments and medications provided to Plaintiffs at the times relevant to the actions at bar. These documents provide important support for Defendants' motion. Nevertheless, the fact that Plaintiffs were provided with treatment is not, by itself, enough to preclude Plaintiffs' Eighth Amendment claims. *Durmer v. O'Carroll,* 991 F.2d 64 (1993). In *Durmer,* the Third Circuit held that a reasonable jury could find that the physician-in-charge at a state correctional facility was deliberately indifferent to an inmate's serious medical need when he failed to provide the inmate with the physical therapy prescribed for the inmate prior to his incarceration. The Third Court accepted Durmer's argument that a reasonable jury could find that the physician was more interested in saving the prison mon-ey than in Durmer's well-being, and that is why he referred Durmer to a specialist instead of providing him with physical therapy.

### 1. Gustavo Cancio [3]

■ Plaintiff Gustavo Cancio ("Cancio") filed a motion to intervene on or about October 26, 1999, which was granted by this Court on March 14, 2000. He died on May 22, 2002. According to the Deputy Medical Examiner of Mercer County, the immediate cause of Cancio's death was "carcinoma of prostate with metastasis.[4]" Pls.' Ex. No. 62.

Prior to his death, Cancio suffered from multiple medical problems, including chronic obstructive pulmonary disease, partial kidney failure, prostate cancer, diabetes mellitus and gout. He was incarcerated in EJSP during all times relevant to this action. According to DOC's quality assurance coordinator, Kenneth R. Wolski, Cancio regularly complained about the level of medical care he was getting at EJSP. Specifically, Cancio often complained about difficulties in seeing medical specialists.

### Lung Problems

Cancio suffered from left chronic obstructive pulmonary disease since 1994. In January 1996, Cancio was transferred to EJSP and was placed in the facility's infirmary. On February 2, 1996, Cancio wrote to Thomas Farrell, supervisor of the health services unit at the DOC, and advised Farrell about his serious medical condition. Cancio complained about his inability to see a doctor and obtain previ-

---

**3.** Plaintiff Cancio suffered from multiple medical problems. Defendants submitted to the court numerous documents containing extensive descriptions of Cancio's medical history. This opinion only addresses the material facts that are in dispute.

**4.** Metastasis is the transfer of disease from one organ or part to another not directly connected with it. Cancio died from the spread of his prostate cancer to other parts of his body. All the medical definitions included in this opinion are taken from MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY (6th ed.2002).

ously prescribed medication. On February 9, 1996, Cancio received a chest X-ray that showed opacification [5] with loss of volume on the right upper lobe, bullous changes bilaterally and large bullae [6] of the left upper lobe, indicating long term damage to his lungs.

On April 1, 1996, Cancio wrote to Dr. Bauer, the chief physician at EJSP and complained about the medical treatment he was receiving. Cancio alleged that: (1) he was not getting his prescribed medication, (2) Dr. Bauer reported to Cancio's superintendent about Cancio's medical condition without reviewing Cancio's medical records; and (3) EJSP's medical staff failed to comply with a specialist's recommendation that Cancio's blood pressure should be checked once a week. Cancio also complained about the cancellation of his quarterly visits with lung and kidney doctors. A copy of this letter was sent to Defendant Fauver.

On May 11, 1996, Cancio was admitted to St. Francis Medical Center in Trenton with a total collapse of his right lung. According to Plaintiffs' medical expert, Dr. Greifinger, Cancio's lung collapse was likely caused by a lapse in medication when Cancio was transferred to EJSP, in January 1996. Cancio remained hospitalized for 48 days. During this hospital stay, he underwent procedures to stop an air leak and to re-expand his right lung.

On May 24, 1996, Mr. Farrell responded to a letter of complaint from Cancio dated from March 1996. Farrell wrote that, according to the information he had received, Cancio "was held in the infirmary area as Temporary Housing, not for medical reasons, and therefore frequent medical supervision was not warranted." Pl.'s Ex. No. 59. Mr. Farrell noted that Dr. Bauer

reviewed Cancio's medical records on January 18, 1996 and prescribed eight medications that he considered appropriate. He also noted that subsequent to Cancio's letter, Cancio has been seen regularly by EJSP's medical staff, Dr. Bauer and several medical speciality consultants, and that it appeared that Cancio had been receiving "appropriate care." Id.

On September 4, 1996, Cancio was seen by Dr. Ricketti, a pulmonary specialist. Dr. Ricketti observed that Cancio's lung was doing fairly well but ordered that Cancio be returned for consultation in January 1997. For undisclosed reasons, these instructions were not followed.

On March 12, 1997, Cancio wrote to Defendants Pinchak and Fauver and requested their assistance in arranging the non-executed follow-up visit with Dr. Ricketti. On April 30, 1997, Cancio wrote to Pinchak and Fauver again to inquire about this issue and about seeing a kidney specialist.

Cancio was sent to Dr. Ricketti on May 14, 1997. Dr. Ricketti noted that Cancio had been sent without his medical records, and that no pulmonary function test, nor recent blood work had been conducted. Cancio later visited Dr. Ricketti on June 6 and July 17. On both occasions Cancio was sent without his medical records. On July 17, Dr. Ricketti examined Cancio's lung X-ray and noted that Cancio was not receiving proper care for his lung inflammation. Dr. Ricketti also complained that EJSP had failed to provide prior CT scan records to the radiologist who was doing a follow-up evaluation. On July 23, 1997, Dr. Ricketti observed that Cancio was sent to him "again with no medical records; no X-

---

5. Opacification is an opaque area probably indicating scar tissue.

6. Bullae are "blebs" caused by chronic lung disease which effectively reduce the surface area of the lung for oxygen transport.

rays available or reports." Defs.' Ex. Cancio–F at 569.

Plaintiffs' medical expert, Dr. Greifinger, alleges that EJSP failed to provide Cancio with Beclovent, an inhaled medication that reduces inflammation in the lung, or a substitute, from September 1997 to February 1998, and again during June of 2000. Defendants, however, claim that Cancio's medical records indicate that Cancio signed for Beclovent, or a substitute medication, in August, October and November of 1997, refused Beclovent in December 1997, and signed for it again in February 1998 and June 2000.

A scheduled visit with Dr. Ricketti for February 1998 was canceled because Cancio was sent without necessary X-rays. On November 28, 1998, Cancio saw Dr. Ricketti, who prescribed antibiotics for him. Dr. Greifinger opines that there was a lag of 10 days until Cancio got his first dose, and that a CT scan of Cancio's chest ordered on December 8, 1998 was not performed until July 28, 1999. Cancio's next visit with Dr. Ricketti was scheduled for February 1999. This visit was cancelled because of transportation problems. On July 28, 1999, Cancio was sent to his appointment with a lung specialist without necessary laboratory test results and records.

### Chronic Kidney Failure

In 1992, Cancio developed kidney failure which was attributed to one of the chemotherapy agents used to treat his lung cancer. Cancio testified that prior to being transferred to EJSP, he had been seen by a nephrologist on a quarterly basis, and that this practice was discontinued at EJSP.

Cancio alleges that in December 1997, a primary physician requested an ultrasound examination of his kidneys but this test was not performed until November 3, 1998. Cancio's medical records, however, indicate that this procedure was performed on December 20, 1997. Cancio also alleges that an ultrasound he received on November 3, 1998, showed abnormal results, and the physician who examined the ultrasound, Dr. Krakovitz, recommended that a follow-up CT scan be conducted. Cancio maintains that the CT scan was not conducted until April 24, 1999. Defendants point out that Dr. Krakovitz's report indicated: "[n]o definite abnormality involving the kidneys...If further imaging is desired, correlation with CT examination on the abdomen might be considered for more complete evaluation." Defs.' Ex. Cancio–F at 757. Defendants claim that Cancio's non-defendant treating physician decided that further imaging was not desired.

On July 23, 1999, Cancio was seen by Dr. Somerstein, a nephrologist. Cancio alleges that CMS's staff failed to provide him with a consultation with a nephrologist for over two years prior to this visit. Defendants contend that Cancio refused a consultation on February 3, 1999, and was seen by a nephrologist on April 30, 1999. On February 4, 2000, Dr. Somerstein requested that Cancio be referred for evaluation for a kidney transplant. Cancio claims that there is no indication that steps were taken to comply with this recommendation.

### Gout

Cancio alleges that he was diagnosed with gout in October 2000. He maintains that CMS failed to treat this disease. Defendants do not address this allegation.

### Prostate Cancer

Cancio was referred to a urologist on March 17, 1999, due to highly abnormal blood test results that are indicative of prostate cancer. This visit was cancelled for undisclosed reasons. In April 2000, Cancio received a prostate specific antigen test ("PSA") that showed abnormally high results. An EJSP physician requested that Cancio be referred to a urologist on

April 24 and May 3, 2000. On May 10, 2000, Cancio was sent to a urologist but the visit was cancelled because Cancio was sent to the wrong doctor. Cancio ultimately saw a urologist on May 24, 2000. The urologist determined that Cancio should undergo a biopsy and see a radiation oncologist. Cancio's biopsy took place on August 23, 2000, approximately three months after the urologist's recommendation. The oncologist prescribed Cancio 30 doses of radiation therapy. Cancio missed his radiation treatments on October 10 and 16, 2000, due to prison transportation problems.

During 2001, Cancio was seen by the radiation oncologist three times to follow up on the progress of Cancio's prostate cancer. Dr. Greifinger asserts that despite the oncologist's instructions, CMS's staff failed to send the results of Cancio's PSA on those visits.

In August, 2001 Cancio had an abnormal bone scan. According to Plaintiffs' medical expert, Dr. Greifinger, the combination of an abnormal PSA and an abnormal bone scan suggests the possibility of metastasis. Cancio alleges that CMS's medical staff failed to inform the radiation oncologist of the abnormalities in Cancio's tests until October 12, 2001. Plaintiffs' expert argues that this failure resulted in a delay of the diagnosis of Cancio's metastasized prostate cancer. Further, Dr. Greifinger opines that the delayed diagnosis contributed to the rapid advance of the disease. On May 22, 2002, Cancio died after suffering severe pain due to the spread of the cancer throughout his body.

*Cancio's Eighth Amendment Claim*

A reasonable jury could find that Defendants were deliberately indifferent to Cancio's prostate cancer. There is no doubt that prostate cancer is a serious medical problem, and that the CMS's personnel who treated this problem were well aware of its existence. Plaintiffs' medical expert,

Dr. Grefinger, maintains that CMS staff failed to send the results of Cancio's PSA test to an oncologist on Cancio's three oncologist visits in 2001. He also maintains that CMS staff did not notify in a timely manner the radiation oncologist who monitored Cancio's prostate cancer about the abnormal results of Cancio's July 2001 bone scan. Plaintiffs' expert argues that these failures resulted in significant delay in the diagnosis of Cancio's prostate cancer, which contributed to the rapid advance of Cancio's illness and ultimately led to his premature death. As noted before, the Third Circuit has found that delaying necessary medical treatment for non-medical reasons may constitute deliberate indifference. *Natale*, 318 F.3d at 582.

The Court rejects Cancio's Eighth Amendment claim with regard to the treatment he received for his other illnesses. Defendants correctly point out that the bulk of Cancio's complaints about the treatment of his chronic obstructive pulmonary disease ("COPD") pertain to actions that were taken prior to the CMS–DOC contract. While Cancio provides several examples in which CMS actions with regard to Cancio's COPD and kidney problems were potentially negligent, i.e. sending Cancio to specialty consultations without requested tests or medical records, Cancio fails to show how he was injured by these actions. Further, it is well settled that allegations of negligence or malpractice are not sufficient to establish an Eighth Amendment violation. *Spruill*, 372 F.3d at 235.

Finally, Cancio did not provide this Court with any proof that he ever complained about this issue to EJSP personnel. Further, the mere fact that Cancio's medical records do not document the treatment of Cancio's gout is insufficient, in this

Court's opinion, for a reasonable jury to find that Cancio was not treated.

### 2. *Stephen Castellano*

■ Plaintiff Stephen Castellano ("Castellano") has been incarcerated at EJSP since 1992. He suffers from heart problems and diabetes.

### *Diabetes*

Castellano has been suffering from diabetes since 1995. It is Dr. Greifinger's opinion that the high levels of sugar in Castellano's blood, throughout Castellano's incarceration at EJSP, indicate a failure by CMS and EJSP to properly treat Castellano's diabetes.

Dr. Greifinger states that CMS failed to annually test Castellano for the presence of protein in Castellano's urine, as required by nationally accepted guidelines for the treatment of diabetes. Dr. Greifinger opines that this failure, in conjunction with CMS's alleged failure to control Castellano's blood sugar level, has resulted in irreversible damage to Castellano's kidneys and heart, and has placed him at greater risk for damage to his eyesight.

In March 1999, Castellano underwent his first urine-protein test. The test found protein in Castellano's urine and indicated that Castellano's kidneys were failing. Since November 2001, Castellano has treated his kidney failure with self-administered medication. Castellano asserts that before he was placed on self-medication, CMS's staff often failed to provide him with his medication in a timely manner.

Defendants' expert witness, Dr. Seth Braunstein, associate professor of medicine at the University of Pennsylvania Endocrinology Department, notes that after protein was detected in Castellano's urine, Castellano was promptly provided with proper medications. Dr. Braunstein also observes that Castellano was free to obtain finger stick glucose readings to monitor the level of sugar in his blood. With regard to potential eye damage, Dr. Braunstein points out that Castellano had several appointments with an eye physician and was never diagnosed with end-organ damage to his eyes.

### *Heart Disease*

In August 1999, Castellano developed chest pain and received an electrocardiogram ("EKG"). The results of this EKG were not disclosed to the Court. On November 26, 1997, Castellano experienced severe pain in his chest. He was treated in the prison's health clinic, and was given another EKG. This EKG was highly abnormal, and Castellano was provided with nitroglycerine. Castellano alleges that what he suffered was a misdiagnosed heart attack. In his deposition, Castellano testified that he was not advised of his abnormally high EKG results and was not made aware of the fact that this heart attack damaged his heart muscle.

On December 15, 1997, Castellano experienced chest pains again. The nurse practitioner who examined him thought that Castellano's pain might be related to his gall bladder. Dr. Greifinger opines that the nurse's failure to consider Castellano' cardiac history, the fact that Castellano was not seen or examined by a physician, and the fact that no EKG was performed, all demonstrate unreasonable and improper treatment.

Defendants counter that the medical staff who treated Castellano's cardiac problems are not defendants in this action. CMS, however, is contractually responsible for providing health care in EJSP, and on-site prison health care providers, including this nurse, are CMS employees. As noted above, Plaintiffs sued John and Jane Does 1–10 and asked for the opportunity to identify other CMS and EJSP defendants after further discovery.

*Sanitary Conditions*

Plaintiff alleges that his exposure to blood-born diseases and the risk of contracting such diseases is increased by virtue of his diabetes, for which he receives two insulin injections per day as well as routine pricks to monitor his blood sugar level. Castellano further alleges that his risk of contracting blood-born diseases is amplified by what he describes as CMS's failure to implement safety precautions or follow basic sanitary procedures. Specifically, Castellano claims that CMS's staff used unsterilized needles in administering insulin to him. He further asserts that on many occasions CMS's nurses failed to use gloves when they took his blood.

Defendants point out that Castellano fails to state any injury that he suffered due to the alleged unsanitary conditions. Defendants also note that the doctor and the nurse that Castellano identified as the individuals who failed to wear gloves, no longer work in the prison's clinic and are not named defendants in this case.

*Castellano's Eighth Amendment Claim*

The Court holds that Castellano presented sufficient support to survive a motion for summary judgment with regard to the treatment of his diabetes. Dr. Greifinger unequivocally states that Defendants failed to properly monitor and control the level of sugar in Castellano's blood, and that this failure resulted in irreversible damage to Castellano's heart and kidneys. In light of Dr. Greifinger's opinion and findings, a reasonable juror could infer that Defendants were deliberately indifferent to Castellano's serious need for medical care. *Natale,* 318 F.3d at 582.

The Court rejects Castellano's claim with regard to the treatment of his cardiac

problems. Castellano fails to show that Defendants ignored or refused to treat his cardiac problems. Castellano also fails to demonstrate that he was injured in any way by the allegedly improper care that he received on December 15, 1997.

The Court finds that Castellano failed to provide sufficient support for his claim that he was exposed to treatment under unsanitary conditions. The Court bases its conclusion on the fact that Plaintiffs' medical expert did not comment on this issue, and the fact that Castellano fails to show that he was injured by this allegedly improper action by former CMS employees.

### 3. *Eugene Drinkard*

■ Plaintiff Eugene Drinkard ("Drinkard") was incarcerated in EJSP from October 17, 1995 [7] through February 1999. He was then transferred to New Jersey's Northern State Prison in Newark, New Jersey where he remained until his death on June 26, 2001. According to Drinkard's "mortality report," he "died unexpectedly" at the age of 48. Pls.' Ex. No. 63.

Plaintiff Drinkard suffered from multiple medical ailments including HIV, diabetes, hepatitis C, high blood pressure, syphilis, macrocytic anemia, liver failure and paranoid schizophrenia. Drinkard alleges that the medical care that CMS provided to him was marked by recurring lapses in his medication and frequent delays in necessary treatments and tests.

In his November 2000 deposition, Drinkard testified that he did not receive any medication during his first three weeks at EJSP. As a result, he caught a severe cold, suffered from dizziness and fainting spells, and was unable to get out of bed.

---

**7.** In their brief, Defendants submit to this Court that Drinkard's term in EJSP started on April 27, 1997; however, his transfer/dis-

charge form from Essex County Jail to EJSP is dated October 17, 1995. Defs.' Ex. D–Drinkard at 2.

Drinkard testified that on or about April 1996 he was placed in administrative segregation. He complained that while in segregation, he did not receive any medication for two to three weeks.[8] Drinkard further complained that during this time he was not physically examined, his blood pressure was never taken, and he was seen by a doctor only after approximately three weeks into his segregation. Drinkard testified that during this time he constantly complained to the nurse about not receiving his medications and was told that he must wait until his medicine would be renewed.

Dr. Greifinger states that Drinkard's medical records seem to suggest that he did not receive much of his prescribed medication between 1997 and 1999. Dr. Greifinger opines that if Drinkard did not get much of his HIV medication promptly, "it would have contributed to an increasing viral load and possible resistance to the medication [Drinkard] took later." Pls.' Ex. No. 1 at 9. Dr. Greifinger concludes that the lapses in medication most likely contributed to Drinkard's profound anemia, diminished his immune system and played a significant factor in Drinkard's early death.

### Liver Damage

Drinkard claims that medicines prescribed for his HIV and schizophrenia were improper and damaged his liver. Drinkard also claims that CMS jeopardized his health by entrusting him, a mentally ill person, with responsibility for administering his own medications. He contends that his inability to reasonably administer his own medications caused him to over- or under-medicate himself.

### Drinkard's Eighth Amendment Claim

■ The Court finds that Drinkard's Eighth Amendment claim is not supported by sufficient evidence to survive a motion for summary judgment. In evaluating a claim for deliberate indifference to an inmate's medical needs, a court should consider the severity of the inmate's medical problems, and the potential for harm if the medical care is denied or delayed. *Maldonado v. Terhune, et al*, 28 F.Supp.2d 284, 289–290 (D.N.J.1998). A court may also consider the actual harm that resulted from the defendant's alleged indifference to the plaintiff's serious medical needs.

Drinkard fails to show how he was injured from his alleged lapses of medication. In fact, Plaintiffs' expert concedes that it is not clear whether these lapses of medication actually occurred. As to the allegedly inadequate medical treatment that Drinkard suffered while in administrative segregation, it is impossible to determine from the information submitted by Drinkard whether this incident happened before or after the CMS–DOC contract commenced. Further, Drinkard fails to show that he was injured due to the allegedly poor treatment he received while in administrative segregation.

Drinkard provides no medical authority to supports his claim regarding the allegedly improper medication that allegedly damaged his liver. Drinkard also fails to identify the physicians who supposedly prescribed him with the improper medication.

Finally, Drinkard's allegation that CMS damaged his health by entrusting him with the administration of his own drugs, has no medical or evidentiary support. The

---

**8.** It is impossible to determine from the parties' submissions when exactly Drinkard was in administrative segregation and when the three week period in which he allegedly did not receive medication occurred. Both parties rely on Drinkard's November 9, 2000 deposition. This deposition indicates that Drinkard was placed in administrative segregation sometime after April 15, 1996, and that he did not receive any of his medications during the first three weeks that he was in administrative segregation.

Court finds that a reasonable jury could not find that Defendants were deliberately indifferent to Drinkard's multiple problems.

### 4. *Walter Griggs*

■■ While at EJSP, Plaintiff Walter Griggs ("Griggs") sustained an injury to his right middle finger on or about March 10, 1997. He was seen by a nurse who reported the injury to the doctor on duty. The doctor ordered that Griggs be sent to the emergency room at Rahway General Hospital.

The emergency room physician observed that Griggs's right middle finger was partially amputated. The X-rays of the injured finger showed a comminuted[9] displaced fracture of the middle finger and a soft tissue injury. Griggs was prescribed antibiotics and pain medication, and he was discharged with instructions to clean the wound daily and to follow up with a doctor.

Back at EJSP, Griggs's injury was noted on his medical chart by Dr. Reddy. The chart provided that "[i]nmate jammed his finger . . . in the door . . . went to Rahway [H]ospital, had stitches, needs daily dressing. The ER sheet was not available on the chart." Defs.' Ex. D–Griggs at 30. Dr. Reddy also noted that the stitches should be taken out in seven to ten days.

Griggs alleges that CMS's staff ignored the hospital and Dr. Reddy's instructions for daily care. As proof, he presents the fact that though he was returned to EJSP from the hospital on March 11, the next entry on his medical chart is dated March 18. On that date, Griggs filed a grievance with the Prisoner's Representative Committee ("PRC") alleging that he informed EJSP's medical staff that his wound was bleeding for days after the injury but was refused the sling that he requested to im-

mobilize his hand. The grievance also stated that Griggs had requested a plastic covering for his finger so that he could take a bath, and was provided with an unsanitary piece of cellophane from a small box. The PRC forwarded Griggs's complaint to Defendant Robinson, who was then a Regional Administrator for CMS.

The parties disagree on the date that Griggs was supplied with antibiotic medication for his bleeding wound. Defendants claim that Griggs was supplied with antiobiotics within two days of his March 18 complaint. Griggs claims that a week and a half passed before he received antiobiotics.

EJSP physician, Dr. Desai, saw Griggs on March 28, 1997. He requested an orthopedic consultation for Griggs's finger. Griggs claims he did not receive this consultation. On April 2, 1997, Griggs was seen by Dr. Desai again. Dr. Desai noted Griggs's injury on the master problem list. He instructed that Griggs be provided with daily sterilizing soaks for two weeks, and follow up with a doctor every other day.

Griggs was next seen by Dr. Desai on April 4 and April 7, 1997. An X-ray of Griggs's fingers revealed a comminuted fracture. Dr. Desai ordered an orthopedic consultation, which was approved by Dr. Neal, the Regional State Medical Director of CMS, and Dr. Parks, CMS's Medical Director at EJSP. For undisclosed reasons, this orthopedic consultation was not conducted.

On May 2, 1997, Dr. Desai noted pain and numbness in Griggs's middle finger, and rescheduled the orthopedic consultation. Griggs alleges that the consultation order was not completed by Dr. Desai until May 20, 1997. On May 21, Dr. Sheppard, an orthopedist, recommended physical or occupational therapy and a follow up

9. A comminuted fracture is a fracture in which a bone is broken in several pieces.

appointment in four to six weeks. Griggs was in physical therapy from June 3 to July 10, 1997. In addition, on June 6, 1997, a metal splint was placed on Griggs's middle finger.

On August 18, 1997, Griggs was seen by Dr. Ziauddin Ahmed, an orthopedist, who noted that Griggs had asked for reconstruction of his right middle finger. Dr. Ahmed advised Griggs that the injured finger's nail would not grow back but that what was left of the damaged nail could be removed. On September 5, 1997, Griggs complained to Dr. Desai about pain and a lack of sensation in his injured finger. Dr. Desai referred Griggs to Dr. Ahmed to address this issue and follow-up on the removal of Griggs's nail. On October 13, 1997, Griggs advised Dr. Sweeting that he had yet to be seen by Dr. Ahmed. Dr. Sweeting completed another consultation request, which was approved by Dr. Parks on October 15. An appointment was scheduled for January 22, 1998.

On October 24, 1997, Desai noted that Griggs was still complaining of pain and a lack of feeling in his injured finger. Desai ordered pain medication and a follow-up visit in four weeks. On January 29, 1998, Griggs was seen by Dr. Ahmed, who recommended a radical excision of Griggs's partial nail growth. The recommended procedure was approved by Dr. Sweeting and Dr. Parks, and was scheduled for August 4, 1998.

On August 4, 1998, a surgical consultation was conducted by Dr. Pagliano, who recommended a complete nail bed ablation.[10] On August 31, Griggs was admitted to St. Francis Medical Center to undergo surgery. After the risks and benefits of the procedure were explained to him, Griggs chose to decline the recommended

nail bed ablation. Instead, he chose a right long finger trigger release, which was performed on September 1, 1998.

On September 15, 1998, an orthopedist recommended an EMG/Nerve Conduction Study.[11] The EMG was conducted on November 9, 1998, and showed carpal tunnel syndrome with evidence of selective impairment of the nerve branches to the right middle finger.

Dr. Fletcher, an orthopedist, saw Griggs on November 24, 1998, and recommended a cockup wrist brace and an elbow pad. Griggs was fitted for the cockup and elbow pad on December 23, 1998, and again on January 20, 1999. Griggs claims that he never received the brace. On February 9, 1999, Dr. Fletcher saw Griggs again and recommended that Griggs undergo surgical decompression of nerves in the injured area, in order to alleviate Griggs's suffering from numbness and pain in his injured hand. Griggs refused the surgery.

On December 27, 1999, Griggs was referred to a physician after he complained of numbness in his hand and arm. About a week later, Griggs was seen by Dr. Moody and consented to have a carpal tunnel release surgery, which was conducted on January 5, 2000. The surgical decompression of nerves, which was refused by Griggs on May 11, 1999, was ultimately performed on February 15, 2000.

Plaintiffs' medical expert, Dr. Greifinger, claims that Griggs experienced unreasonable delays in access to specialty care, which caused Griggs ongoing pain and disability. According to Dr. Greifinger, Griggs's hand injury could have led to a deterioration in function with an impact on Griggs's daily living.

Defendants' expert, Dr. Edward Resnick, an orthopedic surgeon at Temple

---

**10.** Ablation of the nail bed is removal of the nail bed.

**11.** EMG (Electromyography)is a test that measures muscle response to nervous stimulation.

University Hospital, found no fault in the treatment that was provided to Griggs. Dr. Resnick noted that Griggs had declined surgery for a considerable period of time, and that when Griggs agreed to undergo the recommended nerve decompression surgery, his medical condition quickly improved. Defendants maintain that looking beyond Griggs's refusal of surgery, any delay in the performance of surgery on Griggs's hand was based on the opinions of medical experts who are not defendants in this case.

### Griggs's Eighth Amendment Claim

The Court finds that Walter Griggs's Eighth Amendment claim lacks sufficient support to survive a motion for summary judgment. While Griggs and Dr. Greifinger point out that Griggs suffered a delay in treatment, they provide no proof that this alleged delay caused Griggs any significant damage.

Prison authorities are allowed considerable latitude in the diagnosis and treatment of inmates. *Durmer*, 991 F.2d at 67. Griggs was evaluated by physicians and specialists, prescribed medication, and given physical therapy. In addition, he had multiple surgeries. His personal belief that the treatment he received was inadequate is insufficient to establish deliberate indifference. *Spruill*, 372 F.3d at 235.

Based on the affidavits presented by Griggs, this Court holds that a reasonable jury could not find that Defendants were deliberately indifferent to Griggs's hand condition.

### 5. *Dennis Hanna*

█ Plaintiff Dennis Hanna ("Hanna"), an inmate in EJSP, suffers from chronic hypertension.[12] According to Dr. Greifinger, the standard of care in correctional medicine [13] for inmates with chronic diseases requires that they be seen by a physician on a quarterly basis. Dr. Greifinger claims that accepted national guidelines further provide that patients with hypertension should have an annual EKG and an annual testing for blood lipids.

Hanna complains that his hypertension was not monitored between 1997 and 2000. He claims that his entire medical record was lost in 2000. He alleges that he was never offered treatment and was not on EJSP's chronic disease list. Dr. Greifinger opines that CMS's failure to monitor and control Hanna's hypertension created a risk of end-organ damage to Hanna's heart and kidneys, and increased his chances of suffering a stroke and premature death.

Between 1997 and 2000 Hanna was on a low sodium diet, which is recommended for people with hypertension. Hanna complains that CMS's policy of reviewing and approving special diets on a monthly basis interfered with his attempts to maintain his diet. He claims that he was taken off his diet every 30 days, and then forced to wait several days until the diet was re-approved by a physician. During this time he did not receive low-sodium food.

Defendants point to an admission by Hanna in his deposition that CMS never refused to treat him, but that he stopped seeking treatment after his July 1997 tests, as evidence that CMS did not breach a duty to Hanna. Defendants also note that in July of 2000, Hanna finally sought treatment for his hypertension and was prescribed hydrochlorothiazide.[14] Subse-

---

**12.** Hypertension is an arterial disease in which high blood pressure is the primary symptom.

**13.** Correctional medicine is the field of providing medical care in correctional facilities.

**14.** Hydrochlorothiazide is a diuretic drug that is commonly used to treat hypertension. All

quently, Hanna visited the cardiac chronic care clinic and underwent appropriate testing. In July of 2001, Hanna had an EKG, the results of which were within normal limits.

Dr. Greifinger opines that CMS cannot escape its duty of care by claiming that a patient did not seek treatment. According to Dr. Greifinger, CMS must show that it actively offered Hanna treatment for his chronic illness, and that Hanna consciously refused treatment after proper consultation.

*Hanna's Eighth Amendment Claim*

Hanna's Eighth Amendment claim is without sufficient support to survive a motion for summary judgment. Plaintiffs' expert may be correct in finding that the failure to monitor Hanna's hypertension for almost three years constitutes a deviation from the standard of care in correctional medicine. As was repeatedly noted, however, indications of negligence or medical malpractice are not sufficient to establish an Eighth Amendment violation. *Spruill,* 372 F.3d at 235.

Hanna admits that he was never refused medical treatment by Defendants. Further, Hanna testified in depositions that it was his own choice to discontinue medication for hypertension and to refuse testing between 1997 and 2000. It is uncontested that when Hanna sought treatment for his hypertension in July 2000, he received it without delay. Finally, Hanna fails to show how the failure to monitor his hypertension between 1997 and 2000 injured his health. Thus, summary judgment for Defendants on Hanna's Eighth Amendment claims is proper.

the pharmaceutical definitions included in this opinion are taken from the Physicians' Desk Reference (58th ed.2004).

**6. *John Howard***

■ Plaintiff John Howard ("Howard") was incarcerated at EJSP at all times relevant to this action. He is HIV positive and suffers from AIDS. His HIV/AIDS is controlled through the administration of medications that boost the immune system, like Zidovudine and Didanosine.[15] To be effective, these drugs must be administered on a consistent and sustained basis.

Howard alleges that CMS breached its duty to him by repeatedly failing to provide him with his prescribed HIV/AIDS medications, often for significant periods of time. He further alleges that CMS's failure was due, in part, to the fact that CMS regularly misplaced his medical records.

In the opinion of Dr. Greifinger, the failure to provide a patient who suffers from HIV/AIDS with prescribed HIV/AIDS medications, in a timely and consistent fashion, can create viral resistance to these drugs. He maintains that the potential deficiency in the effectiveness of Howard's medications may have exposed Howard to an acceleration in the progression of his disease.

*Delay in Receiving Medication*

Howard claims that in March and April of 1997 he did not receive his HIV/AIDS medications for nearly six weeks. He asserts that he submitted more than 10 requests for his medications but was told by CMS's staff that they could not give him his medications because they could not find his medical records.

According to Howard's testimony, the system used to refill prescriptions was one of the main reasons for the delays in receiving his medication. Howard claims that CMS's staff would not order refills

**15.** Zidovudine (AZT) and Didanosine (DDI) are commonly used in treating HIV related infections.

until the inmate entirely consumed his previous supply. Howard asserts that he was often deprived of medications for several days while waiting for a refill. Howard also testified in depositions that he experienced multiple delays, some longer than a month, in receiving his supply of Ensure, a vitamin beverage that helps HIV patients combat excessive weight loss.

Defendants argue that Howard's medical records show the regular administration of his HIV/AIDS medications. They also maintain that Howard failed to show any injury caused by CMS's alleged failure to provide Howard with prompt medical care.

### Failure to Conduct Prompt Blood Tests

Howard alleges that CMS failed to timely administer blood tests to monitor the progression of his disease. He alleges, without providing dates, that nearly eight months passed during which he did not receive a blood test. Howard also claims that he experienced serious delays in receiving the results of his blood tests.

### Eye Infection

Plaintiffs' expert, Dr. Greifinger, suggests that Howard may have suffered from Cytomegalovirus retinitis ("CMV"), a common eye infection associated with HIV. He claims that Howard probably contracted this infection due to CMS's failure to provide him prompt treatment, and that a failure to timely diagnose and treat CMV may lead to blindness.

Defendants point out that Howard provided no evidence that he suffered from an eye infection, or that his eye infection resulted from CMS's allegedly inadequate treatment. Further, Defendants claim that Howard's allegation that he is now at risk of permanent blindness is not supported by medical diagnosis. Defendants' medical expert, Dr. Chester Smialowicz, an infectious disease specialist, reported that a medical test, performed on March 18, 2000, did not indicate CMV.

### Howard's Eighth Amendment Claim

Howard has failed to support his Eighth Amendment claim with sufficient evidence to survive a summary judgment motion. While the lapses in medication, treatment and testing alleged by Howard, if true, are disturbing, Howard fails to show how he was injured by them. As noted above, in assessing an Eighth Amendment claim, a court may consider the actual harm that resulted from defendant's alleged indifference to an inmate's serious medical needs. *Maldonado*, 28 F.Supp.2d at 289–290.

Plaintiffs' expert opines that Howard may have been injured in two ways from the lapses in his HIV medications: (1) Howard may have contracted CMV, and (2) Howard may have developed resistance to some of his HIV medications. These suppositions are unsupported by evidence. There is no evidence that Howard indeed suffered or suffers from CMV or developed resistance to any HIV medications. Unsupported allegations are not sufficient to survive a motion for summary judgment. *See Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (to repel a motion for summary judgment, the non-moving "party must do more than simply show that there is some metaphysical doubt as to the material facts. It must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations...").

### 7. Geraldo Izquierdo

■ Plaintiff Geraldo Izquierdo ("Izquierdo") is an inmate at EJSP. He complains that Defendants failed to provide him adequate care for his back pain and stomach ailments.

### Back Pain

Izquierdo has suffered from chronic back pain since 1994. A July 11, 1994 X-ray of Izquierdo's lower back did not re-

veal the source of Izquierdo's back pain. When he continued to complain about his back pain, he was provided with rest days, cough medicine and chlorpheneramine.[16] On March 25, 1998, Izquierdo refused any additional medication for his back pain. A chest X-ray was performed on March 31, 1998, which did not indicate any abnormalities.

In June of 1998, Izquierdo suffered back pain while working in the kitchen. He alleges that a nurse rejected his request for immediate medical assistance. He maintains that after three days of unsuccessful requests for treatment, he encountered a corrections officer who took him to the clinic and arranged for Dr. Parks to see him. Izquierdo testified that after he was seen by Dr. Parks, he was placed in the infirmary for a week, during which he received a muscle relaxant and pain medicine but no other treatment. He claims that his week in the infirmary was a form of punishment, intended to penalize him for his complaints.

Within a week of his discharge from the infirmary, Izquierdo complained again about back pain and was prescribed Motrin and a two day rest. He alleges that he was advised to wear a weight-lifting belt but was not provided with the belt until March of 1999. That same month Izquierdo injured his back again when he lifted crates. He maintains that his requests to see a doctor were unsuccessful until his brother-in-law intervened. He was then seen by Dr. Parks, who prescribed Motrin and a muscle relaxant.

Defendants assert that the lower back X-ray that Izquierdo received on June 17, 1998 showed no significant abnormality. Defendants also stress that Izquierdo received medical attention on every occasion on which he complained about back pain.

*Stomach Pain*

In January 1998, Izquierdo complained that he had been experiencing constipation, occasional rectal bleeding and pain in his stomach. CMS's staff prescribed milk of magnesia. In September 1998, he again complained about constipation. He was examined and once again was offered milk of magnesia, which he declined.

In November or December of 1998, Izquierdo observed blood in his stool. In January 1999, he was seen by a doctor who prescribed milk of magnesia, Tagamet and Maalox.[17] On March 5 of that year, Dr. Sweeting examined Izquierdo and referred him to a gastroenterologist. Blood tests performed on March 9 indicated that Izquierdo tested positive for helicobacter pylori bacterium.[18] Izquierdo was prescribed with Doxyclycline and Flagyl.[19]

On March 31, 1999, Izquierdo was transported to St. Francis Hospital, in Trenton, for an endoscopy, but CMS's staff failed to provide Izquierdo with the required enema the night before the scheduled procedure and so the procedure was cancelled. On April 21, 1999, Izquierdo had a colonoscopy, which showed that he was suffering from chronic inflammatory bowel disease and proctitis.[20] Izquierdo alleges that the true results of the colonoscopy were not revealed to him at the time. Instead, an EJSP physician told him was that the results were negative and that he had an ulcer.

16. Chlorpheniramine is an antihistamine used to relieve seasonal allergies.

17. Tagamet and Maalox are medications for heartburn.

18. Helicobacter pylori bacterium is a bacterium that causes ulcers.

19. Doxycycline and Flagyl are antibacterial medications.

20. Proctitis is an inflammation of the rectum or anus.

Izquierdo claims that he only learned about the true results of his colonoscopy when he was seen by a specialist at St. Francis in July of 1999. He contends that the specialist provided him with a copy of the original results and told him that he had actually been prescribed a suppository treatment two months earlier. Izquierdo alleges that when he provided CMS's staff with a copy of the real results of his colonoscopy, and the prescription ordered by the GI specialist, he was told by a nurse that his file had been lost. Consequently, the order for suppositories was delayed by an additional five days.

On September 1, 1999, Dr. Gersten, a gastroenterologist, examined Izquierdo. Dr. Gersten indicated that he was unable to perform an endoscopy on Izquierdo because Izquierdo had eaten breakfast. Izquierdo alleges that EJSP's staff failed to inform him that he should not eat breakfast on the morning of the scheduled endoscopy. In his report, however, Dr. Gersten stated that, in any event, there was no need for Izquierdo to undergo the procedure, and no need for further follow-up. Izquierdo alleges that he continued to suffer from stomach pain and rectal bleeding, and often visited EJSP's infirmary throughout 1999 and 2000.

### Delay in Medication

Izquierdo claims that on several occasions he was not provided with medication prescribed for him in a timely fashion. For example, Izquierdo alleges that it took CMS's staff six months to provide him with Metamucil, a medicine for constipation. Izquierdo fails to provide a specific time period for this six month lapse. Izquierdo also asserts that he never received the heartburn medicine, Prilosec, which was prescribed for him. Dr. Greifinger observed that Izquierdo suffered an eight-week delay in receiving medications prescribed for rectal bleeding.

### Izquierdo's Eighth Amendment Claim

Izquierdo's Eighth Amendment claim is without merit. While Izquierdo complains about delays in the receipt of treatment and medication, he fails to demonstrate that these delays amount to deliberate indifference on Defendants' part.

First, Izquierdo complains about the treatment he received for his back pain, but fails to provide proof of any serious back injury. Furthermore, he received pain relievers for his back pain. Dr. Greifinger, who reviewed Izquierdo's medical records, makes no mention of back problems. Further, two back X-rays received by Izquierdo, in July 1994 and June 1998, showed no significant abnormalities in Izquierdo's back.

Izquierdo also complains about the treatment he received for his stomach pain. The evidence provided by Izquierdo may suggest that CMS has been negligent in treating Izquierdo's stomach pain. For example, CMS personnel failed to provide Izquierdo with a required enema the night before a scheduled endoscopy procedure, which led to the cancellation of that procedure. It is undisputed, however, that Izquierdo was repeatedly examined by EJSP physicians and outside gastrointerologists about his complaints of stomach pain, constipation and rectal bleeding. Ultimately, his bowel disease and ulcer were diagnosed and he was provided with treatment and medication. As noted previously, indications of possible malpractice or negligence are not sufficient to sustain an Eighth Amendment claim. *Spruill,* 372 F.3d at 235.

### 8. Randolph Jackson

■ Plaintiff Randolph Jackson ("Jackson") suffers from HIV/AIDS and Hodgkin's Lymphoma. He claims that since CMS assumed responsibility for medical treatment in EJSP, he has not

received adequate medical care for his life-threatening diseases.

### HIV/AIDS

Jackson claims that he suffered constant delays in receiving his HIV/AIDS medications. On January 23, 1997, the PRC wrote to Steve Housberg, CMS's Regional Administrator, to inform him that Jackson and another inmate suffering from AIDS had not received their renewed medications for *two to three weeks*. PRC's weekly medical complaint report of February 4, 1997 stated that Jackson had not received his Resource nutrition supplement for four days. A PRC report from April 7, 1997 suggested that the progression of Jackson's disease was not being monitored properly. Jackson did see a doctor every 90 days, but only in order to renew his supply of medication. No examinations were made. The report indicated that Jackson had not been seen by an infectious disease specialist, and implied that Jackson's supply of the food supplement, Ensure, had also been delayed. The report concluded that EJSP's medical staff failed to provide adequate care to inmates with HIV/AIDS. Pls.' Ex. 69.

On November 19, 1997, Jackson wrote to Defendant Pinchak and complained that he was unable to meet with doctors and obtain his medications in a timely manner. Jackson wrote that he had yet to receive a medicine prescribed for him on January 1, 1997. Jackson alleges that at the time that he wrote this letter he was suffering from a severe cold and was unable to see a physician. Jackson testified that he received no answer to his complaints, and was only examined by a physician after he fortuitously encountered Pinchak in person.

Jackson also complained about his medical care to Defendant Robinson, CMS's Regional Administrator. He claims he never received a response to his complaints. In January and February of 1998, Jackson continued to complain about not receiving prescribed medication in a timely manner.

### Pneumonia

At the end of 1996, Jackson developed a cough and discomfort in the left side of his chest. He alleges that despite multiple complaints about his discomfort and his persistent cough, he did not receive a chest X-ray until January 13, 1998. This X-ray was negative for pneumonia.

When Jackson's symptoms persisted, a second X-ray was taken in February 1998. Because the second X-ray suggested that Jackson might have tuberculosis, Jackson was transferred to St. Francis Medical Center for further testing. At St. Francis, Jackson was diagnosed with pneumonia, not tuberculosis. Subsequently, Jackson was hospitalized at St. Francis for 11 days. Jackson alleges that when he returned to EJSP, he suffered ten day delay in receiving his medication for pneumonia.

Dr. Greifinger states that Jackson's pneumonia was most likely preventable and was probably caused by CMS's failure to timely provide Jackson with proper medication. Defendants dispute Jackson's claim that he suffered delays in receiving medical attention and medication. They also note that none of the treating doctors, accused by Jackson of failing to timely diagnose his pneumonia is a defendant in this action.

### Hodgkin's Lymphoma/Hodgkin's Disease

In December of 2001, Jackson was diagnosed with Hodgkin's disease. According to Dr. Greifinger, interruptions in Jackson's HIV medication probably contributed to the development of his Hodgkin's disease. Defendants' medical expert, Dr. Chester Smialowicz, an infectious disease specialist, disputes Dr. Greifinger's finding

and claims that the treatment provided to Jackson was within nationally accepted standards. Dr. Smialowicz, however, *concedes that there were notable delays in providing Jackson with HIV-related care.* He opines that both Jackson and CMS are responsible for these delays.

Defendants point out that Jackson's CD4 counts and viral load readings improved under the care of CMS's physicians.[21] They allege that any deterioration in Jackson's HIV/AIDS did not result from inadequate care, but from Jackson's high resistance to conventional HIV and AIDS treatments.

*Jackson's Eighth Amendment Claim*

A reasonable jury could find that Defendants were deliberately indifferent to Jackson's HIV/AIDS condition and Hodgkin's disease. Both of these life threatening illnesses are serious medical conditions that require careful medical care. There are strong indications that, at least during part of the period pertinent to this action, Defendants failed to properly monitor the progression of Jackson' HIV/AIDS, and often failed to timely provide him with necessary medications.

Jackson provided this Court with documentation of multiple complaints that he personally submitted, or were submitted by PRC on his behalf, about not receiving HIV/AIDS medications and not being examined by physicians and specialists. A PRC report from February 4, 1997 specifically concluded that Jackson and other HIV/AIDS patients at EJSP were not receiving proper care for their life-threatening illnesses. After his February 1998 hospitalization, Jackson was allegedly forced to wait ten days for his pneumonia medication. It is important to note that Jackson was an HIV/AIDS patient who had just come back from 11 days of hospitalization due to pneumonia condition. It is also important that even Defendants' expert, Dr. Chester Smialowicz, recognized gaps in the HIV medications provided to Jackson. Defs.' Ex. D.

Dr. Greifinger opines that the interruptions in Jackson's HIV medication probably contributed to the development of Jackson's Hodgkin's disease. He also opines that lack of medical care probably led to other documented complications like pneumonia and a general deterioration of Jackson's immune system. Pls.' Ex 1 at 11.

In conclusion, it is uncontested that Defendants were aware of Jackson's serious medical needs. A genuine issue of material fact exists as to whether they deliberately failed to promptly address those needs. Thus, summary judgment is not proper.

### 9. *Abdul Khaliq*

 Plaintiff Abdul Khaliq ("Khaliq") is an inmate at EJSP. He claims that Defendants were indifferent to several of his medical problems, including hypertension.

*Hypertension*

Khaliq alleges that the treatment and monitoring of his hypertension worsened because CMS often misplaced or lost his medical records. Plaintiffs' medical expert, Dr. Greifinger, notes that the part of Khaliq's medical records that are available, for the period of 1997 to 2000, are largely illegible.

Dr. Greifinger states that quarterly examinations by a physician and blood pressure checks are required for monitoring

---

**21.** CD4 count and viral load are common tests for determining the progression of HIV/ AIDS.

and treating hypertension. Khaliq contends that his blood pressure was not checked for two years, and that he was not seen by a doctor on a quarterly basis. Khaliq further alleges that he was forced to wait one year for an EKG, and that he was never examined for end-organ failure.

On May 30, 1997, Khaliq wrote to Defendants Pinchak and Fauver, and advised them that he had filed several complaints regarding CMS's failure to check his blood pressure and to provide him with medicine to control his blood pressure. Khaliq claims that Pinchak and Fauver did not respond to his letter. Khaliq also complained that his prescription for Corgard, used to treat hypertension, was discontinued at the beginning of 1997.

Defendants' medical expert, Dr. Robert Perkel, from the Department of Family Medicine at Thomas Jefferson College in Philadelphia, opines that CMS's physician, Dr. Reddy, made a reasonable decision when he ordered that Khaliq should stop taking Corgard on March 6, 1997. Dr. Perkel explains that this decision was justified because Khaliq did not have a history of cardiac problems. He further notes that in July of 1997, Khaliq's blood pressure readings warranted resumption of treatment and that Khaliq was then prescribed Tenormin.[22] Dr. Perkel also opines that even though there were lapses in the monitoring of Khaliq's blood pressure, Khaliq's blood pressure was generally kept within normal levels.

### Fallen Arches and Eye Problems

Khaliq suffers from fallen arches and must wear special shoes with orthopedic arches built into them. Khaliq asserts that despite the fact that he was prescribed medical shoes by a specialist, CMS never provided him with the necessary shoes. Consequently, he still wears boots that he purchased in 1996.

Without providing dates, Khaliq also alleges that he was forced to wait three years for glasses that were prescribed to him by an eye specialist. Defendants do not address Plaintiff's allegations with regard to his eye or foot problems.

### Khaliq's Eighth Amendment Claim

Khaliq fails to provide sufficient support for his Eighth Amendment claim in order to survive Defendants' motion for summary judgment. This Court may consider the actual harm which resulted from Defendant's alleged indifference to Khaliq's serious medical needs when evaluating Khaliq's Eighth Amendment claim. *Maldonado*, 28 F.Supp.2d at 289–290. Khaliq complains about CMS's failure to monitor his hypertension, but he does not document how he was injured in any way.

Khaliq does not dispute Defendants' submission that he was taken off his medication for hypertension and later put on a different medication under the supervision and recommendation of his physician. He also does not dispute Defendants' claim that his blood pressure was generally kept within medically recommended levels. It is well settled that a prisoner's subjective dissatisfaction with his medical care does not, by itself, indicate medical indifference. *Monmouth County*, 834 F.2d at 346.

Khaliq fails to provide any support for his alleged orthopedic problems. He has provided no medical records and his expert does not comment on the issue. Khaliq also fails to support his claim that prescribed eyeglasses were denied for three years. Khaliq does not provide evidence as to the seriousness of his eye condition nor as to the harm that he suffered due to CMS's alleged failure to provide him with prescribed eyeglasses. It takes more than an allegation with no, or very little, sup-

---

22. Tenormin is a beta blocker used by patients with hypertension.

port to survive a motion for summary judgment. *Quiroga,* 934 F.2d at 500.

### 10. *Derrick Lewis*

■ Plaintiff Derrick Lewis ("Lewis") complains about allegedly improper treatment that he received for a series of ear infections and headaches. In October of 1996, Lewis complained to PRC about not receiving medication for an ear infection. The complaint was forwarded to CMS's Administrator, Steve Housberg, on November 4, 1996. Lewis alleges that he did not receive a response to his complaint. PRC brought the matter to Mr. Housberg's attention again on December 29, 1996.

Without specifying a date, Lewis alleges that when he started experiencing problems in his ears, an EJSP physician examined him and told him that he had an ear infection. Lewis claims that physician prescribed eardrops but that he did not receive them for a long time. He further alleges that when he requested the eardrops, various medical personnel told him that the medication was old, had been lost, or that the doctor had forgotten to order it.

Lewis claims that he finally received the eardrops when he was seen by an ombudsman approximately one year after he initially complained about pain in his ears. He complains that while the medicine eliminated the pain in his ears, he experienced a loss of hearing in his left ear. Dr. Greifinger observes that in June 1997, it took in excess of seven weeks for Lewis to receive medication for his ear infection. In Dr. Greifinger's opinion, CMS's failure to promptly provide Lewis with medication for his ear infection put Lewis in danger of becoming deaf.

Defendants make the point that Lewis cannot specify when he was prescribed medication for his ear infection nor whether it was a CMS doctor who prescribed this medication. They claim that Lewis has received all the medication that was prescribed for him following April 27, 1996, the day CMS assumed responsibility for medical care at EJSP. Defendants allege that in August of 1996, Lewis was prescribed and received Entex LA,[23] and on January 27, 1997, he received Amoxil, Chlortrimeton and Motrin.[24] Defendants reject Dr. Greifinger's allegation that in June of 1997, Lewis had to wait seven weeks for his medication. According to Defendants, Lewis's medical records suggest that the eardrops prescribed for Lewis were delivered within four weeks.

Defendants also point to the fact that Lewis conceded that the symptoms from which he suffered disappeared after he received his medication, and that Lewis never sought medical care for his alleged loss of hearing. Defendants' medical expert, Dr. Robert Perkel, opines that the treatment that Lewis received for his ear infection was proper. Dr. Perkel also maintains that Lewis suffered no permanent hearing loss and that it is extremely rare for an ear infection, of the kind that Lewis suffered, to lead to deafness.

Lewis also complains that on December 12, 2000, he was denied a CT scan, which he requested because of repeated headaches. Defendants allege that no doctor had ever recommended that Lewis receive a CT scan and that Lewis was treated with pain medications. Dr. Perkel points out

---

**23.** Entex LA is a drug used for relief of dry, nonproductive cough, nasal congestion and mucus in the breathing passages.

**24.** Amoxil is an antibiotic used to treat a variety of infections, including middle ear infections. Chlortrimeton is an anti-histamine commonly used in treating cold and allergy symptoms.

that extensive office and laboratory testing done by EJSP physician, Dr. Sweeting, on December 9, 1998, came back normal. At that time, Lewis also received an EKG, the results of which were normal.

*Derrick Lewis's Eighth Amendment Claim*

Lewis fails to support his Eighth Amendment claim with sufficient evidence to survive a motion for summary judgment. Lewis complains about Defendants' alleged failure to promptly address a series of ear infections that he suffered. Dr. Greifinger opines that the alleged delays could have put Lewis at risk of deafness and meningitis, but Lewis does not provide any evidence about the seriousness of the infection from which he suffered. While Lewis claims that he suffered some loss of hearing in his left ear, he provides no proof to support this allegation. Further, Lewis's medical expert, Dr. Greifinger, fails to comment about this allegation.

The Court finds Defendants' admission that it took CMS four weeks to provide Lewis with prescribed eardrops in mid–1997 very disturbing. Despite this delay, however, it is uncontested that Lewis eventually received medication that cured his infection and relieved his symptoms. Further, there is no evidence that Lewis suffered any long term or irreversible damage from the allegedly inadequate medical treatment he received.

Finally, Lewis complains that his December 2000 request for a CT scan was denied for non-medical reasons, but he fails to show why this CT scan was warranted. It is uncontested that no doctor had ever requested a CT scan for Lewis. Further, Defendants' point out that Lewis was examined by CMS physicians and treated for his headaches on multiple occasions. Defendants' expert found the treatment of Lewis's headaches proper, and

Plaintiffs' expert did not dispute or even comment on the issue.

In light of the above, this Court concludes that a reasonable jury could not find that Lewis had a serious medical need that was ignored or deliberately mistreated. Thus, summary judgment is proper.

**11. Mufeed Muhammad**

 Plaintiff Mufeed Muhammad ("Muhammad") was incarcerated in EJSP from 1994 to 2000. During this time, Muhammad filed numerous complaints and requests for medical attention with regard to persistent cardiac problems, ear infections, high blood pressure, and back pain.

*Cardiac Problems*

On October 8, 1998, Muhammad complained about chest pains and was examined by an EJSP physician. Muhammad alleges that despite a medical history of heart disease, the doctor did not perform an EKG and did not follow up on Muhammad's elevated blood pressure. Defendants explain that these measures were not taken because the doctor found that Muhammad's blood test results were within normal limits, with the exception of a slightly elevated glucose level.

On February 1, 1999, Muhammad complained about chest pains again. He was seen by a nurse who gave him a bottle of Maalox[25] and referred him to a doctor. Muhammad told the nurse that a year before he had been scheduled for an EKG but the test had been cancelled.

Dr. Parks examined Muhammad on February 26, 1999, and ordered an EKG and a 24–hour heart monitoring test. The EKG showed that Muhammad had a heart murmur but failed to reveal the cause of his chest pains. Muhammad alleges that the 24–hour heart monitoring test was nev-

25. Maalox is commonly used to treat symp- toms of acid indigestion and heartburn.

er conducted. He further alleges that on several occasions he requested emergency medical treatment for pain in his chest and an elevated heart beat, and did not receive treatment until a week had passed.

In March 2001, Muhammad's chest pains intensified and he filed several requests for medical attention. Muhammad alleges that he had to file numerous requests and complaints before he was seen by a doctor. An X-ray performed on August 31, 2001 showed no cardiac abnormalities, and an EKG performed in October of 2001 showed insignificant valvular abnormalities. A stress test, however, indicated a high resting blood pressure.

Muhammad complains that he was not provided with heart medication and is still suffering from chest pains. In response, Defendants note that Muhammad's medical records indicate that he has been prescribed Verapamil since October 24, 1995 and Maxzide since August 28, 1996.[26] Defendants also note that Muhammad was prescribed Lopressor and Imdur on September 13, 2001.[27]

Defendants point out that Dr. Greifinger did not provide any medical assessment of Muhammad's heart condition. Dr. Greifinger only commented that CMS's staff should have monitored Muhammad's chest pains more carefully because untreated chest pain can lead to a heart attack.

### High Blood Pressure

Muhammad began taking blood pressure medication in 1983. He claims that after CMS started to provide medical care in EJSP, he experienced delays in receiving his medication for blood pressure. Specifically, Muhammad claims that he was without this medication between July 2 and July 9, 1998, and then again on four differ-

ent occasions in 1999, during which he was without his medication for blood pressure for 10 to 20 days.

Muhammad claims that in order to get what should be routine treatment for high blood pressure, he must make numerous requests and complaints. For example, on April 5, 1999, Muhammad requested a refill for his long used blood pressure medication. Three days later, he was informed that he must see a doctor before his prescription could be refilled. On April 21, 1999, Muhammad wrote to Ms. Offei, Assistant Administrator in EJSP, and complained that the EJPS medical department would not permit him to see a doctor in order to obtain his refills. Similarly, Muhammad complains that in July 1999, April 2000, and January 2001, he had to make three different requests for his blood pressure medication.

Muhammad also complains that CMS's procedure often interfered with his ability to maintain the low-sodium diet that he follows in order to help control his blood pressure. Muhammad alleges that his diet must be approved by a physician every 90 days, and that this procedure often causes him significant delays in receiving the food he needs. In Dr. Greifinger's opinion, the interruptions in Muhammad's blood pressure medication and diet raise Muhammad's risk of stroke and heart and kidney diseases.

### Ear Infection

In 1995, Muhammad developed a severe ear infection. He was given several different antibiotics, which failed to solve the problem. Muhammad alleges that two months lapsed between his initial complaint and the time that he was referred to

---

**26.** Verapamil is used to treat angina, irregular heartbeat and high blood pressure. Maxzide is a diuretic used in the treatment of high blood pressure.

**27.** Lopressor and Imdur are used in the treatment of high blood pressure and angina pectoris.

an ear specialist who prescribed proper medication. A subsequent ear test at St. Francis Medical Center showed that the prolonged ear infection had caused a partial loss of hearing in his left ear.

On January 28, 1998, Muhammad complained of decreased hearing in his left ear. On February 20, 1998, Dr. Rossos, an ear specialist, diagnosed a cystic lesion in Muhammad's left ear. Dr. Rossos prescribed Muhammad Bactrin and Cortisporine.[28]

Dr. Rossos examined Muhammad again on March 20, 1998. He noted that Muhammad was sent without his medical records. He diagnosed Muhammad with resolved otitis[29] and prescribed the same medication he had prescribed on February 20. Muhammad alleges that he needed to wait seven days before receiving his medication.

Defendants reject Muhammad's claim that their failure to treat his ear infection might have caused him further hearing loss. They allege that Muhammad was diagnosed with mild conductive hearing loss two years prior to the CMS–DOC contract, and there is no indication that he has suffered further hearing loss since that time. Defendants also point out that the treatment of Muhammad's ear problems was prescribed by Ear Nose and Throat ("ENT") specialists that are not Defendants in this action.

*Back Pain and Nerve Damage*

Muhammad has experienced degenerative changes in his back since 1992. On March 8, 1996, Muhammad fell on ice and hurt his lower back. Muhammad went to the infirmary and received ibuprofen and a muscle relaxant. On March 15, he was examined and medication was ordered for him. On April 1, 1996, Muhammad received an X-ray of his back. The parties have not provided this Court with any information about the results of this X-ray. On April 4, 1996, Plaintiff was referred to an orthopedist; however, he was not treated because his chart could not be found.

Muhammad alleges that he needed to file numerous complaints in order to receive medical attention for his back pain. He also alleges that the medication that was prescribed for his back pain on June 19, 1996, was not delivered until July 21, 1996, and that CMS refused his request for an MRI of his lower back.

At some point during 1997, Muhammad developed numbness in his right arm. An X-ray conducted in August of 1997 showed degenerative changes associated with nerve problems in his neck. Muhammad was referred to a neurologist on October 7, 1997. The referral, however, was conditioned on Muhammad's consent to undergo surgery, which Muhammad refused. Dr. Greifinger opines that it was wrong for CMS to impose such a condition on Muhammad's referral, because it is possible that the neurologist would have prescribed a non-surgical treatment.

Defendants explain that Muhammad's MRI request was denied because CMS's staff found no clinical reason to perform the procedure. They further explain that because Muhammad has not complained about numbness in his right arm since 1997, CMS has not found it necessary to address the issue.

*Swollen Face and Skin Infection*

On July 17, 1997, Muhammad suffered from swelling in his face, tongue and arms. CMS's personnel performed blood tests on Muhammad, the results of which were inconclusive. Muhammad received medication and was told that the swelling was

---

**28.** Cortisporine is an antibiotic and steroid combination used to treat ear infections.

**29.** The diagnosis of "resolved otitis" seems to mean that Muhammad's ear was no longer inflamed.

probably an allergic reaction to food. He saw a doctor again on September 23, 1997, and further medication was ordered. The reason behind Muhammad's swelling remained undetermined, and Muhammad still occasionally suffers from this problem.

Defendants claim that since Muhammad started complaining about his swelling, he has been treated by CMS staff whenever the symptoms have arisen. They claim that it is not uncommon to fail to discover the source of an allergic reaction; thus, it cannot be viewed as an indication of deliberate indifference on their part.

On October 8, 1998, Muhammad was referred to a podiatrist for an ingrown toenail, an abscess, and a deep skin infection. Muhammad alleges that he was forced to wait until November 9, 1998, to see the podiatrist. On November 22, 1998, Muhammad complained that he did not receive the medication that was prescribed to treat his deep skin infection. Muhammad claims that the delays in treatment created an unnecessary risk that his infection would spread into his bloodstream. Defendants point out that this claim is not supported by any medical authority. They explain that it took 32 days for Muhammad to see a podiatrist because Muhammad's problem was not urgent.

*Muhammad's Eighth Amendment Claim*

Genuine issues of material facts exist with regard to the treatment that Muhammad received for his back pain, neck-nerve damage, and numbness in his hand. In 1997, Muhammad developed numbness in his right arm. An X-ray conducted in August of that year showed degenerative changes associated with nerve problems in the neck.

CMS conditioned Muhammad's referral to a neurologist on Muhammad's pre-agreement to undergo surgery, which Muhammad refused. Defendants argue that Muhammad's arm and neck problems cannot be considered a serious medical issue because Muhammad has not complained about it to EJSP's medical staff since 1997.[30] At the relevant time, however, CMS staff considered the problem a serious medical issue and chose to refer him to a neurologist. It is uncontested that this referral was contingent on Muhammad's pre-agreement to undergo surgery. Dr. Greifinger opines that this condition was unreasonable and caused Muhammad to decline a necessary medical examination. Defendants do not address this claim. The Court concludes that an issue of material fact exists and the claim survives the Defendants' motion for summary judgment.

Genuine issues of material fact also exist with regard to the treatment Muhammad received for his high blood pressure and cardiac problems. While conceding that Muhammad has suffered delays in receiving his blood pressure medications, Defendants contend that no documented injury has resulted from these delays. Dr. Greifinger, however, opines that the failure to adequately monitor Muhammad's heart condition and the gaps in Muhammad's blood pressure medication put Muhammad's life in danger. This genuine dispute

30. At the summary judgment hearing, Defendants claimed that Muhammad's complaint about CMS's demand that he would pre-consent to surgery is barred because it was not raised in Muhammad's Second Amended Complaint. A review of Muhammad's Second Amended Complaint, however, indicates that he generally complained about the treatment he received for his back problems. Further, Dr. Greifinger's report, which Defendants received prior to filing this motion, specifically discusses this issue. Finally, Defendants had another opportunity to address this issue in their reply brief dated June 12, 2003. The fact that they neglected to do so does not bar Muhammad's claim.

of material fact should not be resolved on a motion for summary judgment.

The Court finds Muhammad's Eighth Amendment claim with regard to the treatment of his ear infections to be without merit. Muhammad complains that he was not referred to an ENT specialist from 1995 to January 1998. The record shows, however, that CMS staff treated Muhammad's ear infections whenever he had them. There is no indication that CMS officials refused any primary doctor's request to refer Muhammad for an ENT consultation. Similarly, Muhammad's claims that he should have had audiograms to follow up on his hearing condition is not supported by any medical authority. Neither the ENT specialist who saw Muhammad in 1998 nor the physicians who treated his ear infections ever made such a request. That Muhammad disagreed or is unsatisfied with the medical care that he received is not enough to establish an Eighth Amendment claim. *Spruill*, 372 F.3d at 235.

Finally, the Court agrees with Defendants that Muhammad fails to show that he sustained any medical injury as a result of the allegedly improper medical care he received for his ingrown toenail and his allergies. Thus, summary judgment is warranted with regard to these complaints.

12. *Thomas Musto*

■ Plaintiff Thomas Musto ("Musto") was incarcerated in EJSP until August of 2000, when he was transferred to NJSP. He suffers from severe persistent asthma and post-traumatic stress disorder. He argues that he incurred undue pain and suffering, and was exposed to grave medical risks because of the CMS staff's alleged deliberate indifference to his medical problems.

*Chronic Asthma*

Musto must take medication for severe asthma on a consistent and sustained basis in order to be able to breathe comfortably. According to Dr. Greifinger, failure to take this medication in such a fashion may render the medication ineffectual and can expose a patient suffering from asthma to respiratory infections. Musto first complains that CMS failed to provide him with his medication on a consistent basis. Second, Musto alleges that CMS often altered his medical regimen without a physician's authorization. Third, Musto claims that CMS failed to timely respond to his requests to consult with a doctor. Finally, Musto claims that CMS has misplaced his medical records on several occasions, further delaying his receipt of necessary medication.

Musto alleges that the system used by CMS to refill medications was one of the main reasons why he suffered delays in receipt of his medication. He complains that CMS would only order a new supply of medication when he used up his previous prescription in its entirety. Thus, Musto alleges that several days often passed during which he went without medication.

Musto wrote several letters to Defendant Pinchak complaining about delays in the supply of his medication. He claims that he had a meeting with Pinchak, in which Pinchak assured him that he would suffer no more delays. Musto alleges that Pinchak did not keep his promise.

Musto complains that CMS constantly altered his medication without a physician's prescription. He specifically complains about constantly receiving different inhalers.

Musto alleges that CMS's nurses often refused his requests to see a doctor when his medical situation required it. Without stating a date, Musto describes being

forced to wait nearly two months to see his physician and receive a blood test to monitor his asthma.

Musto complains that CMS failed to adequately monitor his pulmonary disease. It is Dr. Greifinger's view that because CMS failed to monitor Musto's asthma and failed to schedule regular appointments with a lung specialist, Musto risked developing pneumonia and lung collapse. Dr. Greifinger also concludes that the undertreatment of pulmonary disease can lead to permanent physical disability and premature death.

Defendants claim that Musto does not support his allegations with specific dates or documents. They allege that Musto's medical records indicate that he has not suffered from an asthma attack since April 27, 1996. Further, Musto's medical records since August 2000 disclose no medical complaints regarding Musto's respiratory condition.[31]

Defendants' medical expert, Dr. Sandra Weibel, clinical assistant professor at Thomas Jefferson University's Division of Pulmonary Diseases, opines that the fact that Musto was never hospitalized for his asthma is a strong indication that he was properly treated. Dr. Weibel observes that when Musto received generic brand inhalers instead of the name brand inhalers he had previously used, the substitute inhalers were equivalent to the name brand inhalers. On this reasoning, Dr. Weibel asserts that the use of generic inhalers to treat Musto's asthma was reasonable.

### Post–Traumatic Stress Disorder

Musto suffers from post traumatic stress disorder ("PTSD"), which started after his military service in the Vietnam War. For approximately five years prior to the CMS–DOC contract, Musto took Serax to ameliorate the effects of his PTSD. Musto alleges that despite the fact that Serax effectively controlled the symptoms of his PTSD, CMS replaced it with a different drug without explaining to him why the replacement was necessary. Musto further alleges that the new drug he received was ineffective, and that he is consequently no longer taking any medication for his PTSD.

Defendants explain that Musto was taken off Serax because of the drug's addictive properties. On November 29, 1996, a psychiatrist who evaluated Musto determined that Musto was using PTSD as means to gain access to Serax. The psychiatrist reduced Musto's dosage of Serax and referred him for psychological counseling. Musto was offered an alternative drug that he rejected. Defendants note that Musto is not suing the physician that discontinued his prescription for Serax.

### Musto's Eighth Amendment Claim

Musto fails to support his Eighth Amendment claim about the treatment of his asthma with sufficient evidence to survive a motion for summary judgment. Musto levels general complaints about delays in receiving his asthma medication. Musto also complains about CMS's alleged failure to monitor the progression of his asthma. Musto fails, however, to specify how these alleged delays have injured his health. In fact, Musto's medical records indicate that he suffered no asthma attacks since the CMS–DOC contract began. Further, Musto makes no claim that any such attack ever occurred, and there is no indication or claim that he was ever hospitalized due to pulmonary problems. Finally, Musto does not dispute Dr. Weibel's conclusion that the generic brands of inhalers

---

**31.** In August 2000, Musto was transferred from EJSP to New Jersey State Prison in Trenton where he remained until the conclusion of his incarceration in New Jersey in 2001.

he received were equivalent to the name brand inhalers he preferred.

Musto also fails to sufficiently support his Eighth Amendment claim with regard to the treatment of his PSTD. Musto does not contest the fact that he was taken off the medication Serax by a treating psychiatrist, who referred Musto for psychological counseling and prescribed alternative medication. Musto is not suing the treating psychiatrist.

As mentioned previously, the mere fact that an inmate is dissatisfied with the treatment he has received is not sufficient to establish an Eighth Amendment claim. *Spruill*, 372 F.3d at 235. Thus, summary judgment against Musto is proper.

### 13. *Jerome Perkins*

■ Plaintiff, Jerome Perkins ("Perkins"), an inmate at EJSP, suffers from several medical conditions, including back and foot deformities, severe peripheral vascular disease, varicose veins and prostate cancer. Throughout 1996 and 1997, Perkins wrote multiple letters to Defendants Pinchak, Robinson and Dr. Parks in which he complained about delays in receiving medication, treatment and access to specialists.

#### *Hernia*

In early 1996, EJSP's physician, Dr. Bauer, advised Perkins that his ruptured hernia required surgery. Perkins claims that he made several inquiries and numerous complaints about CMS's failure to schedule his surgery. He complains that while he was waiting for the operation, he suffered from swelling of the right groin, which caused him extreme pain and difficulty in walking.

Perkins's medical file indicates that on July 3, 1996, Dr. Bauer found no hernia but noted a very small defect in the abdominal wall. On October 29, 1996, EJSP's physician, Dr. Saclolo, requested a surgical consult for Perkins, noting Perkins's complaints of pain and the existence of a reducible hernia. Dr. Parks denied the request on October 31, 1996, instructing that conservative treatment should continue.

On March 20, 1997, Perkins complained of pain in both of his legs. A recurrent inguinal hernia[32] was diagnosed. Dr. Greifinger states that on April 24, 1997, Dr. Sweeting requested that Perkins undergo surgery. This request was approved by Dr. Parks on September 29, 1997. Perkins was seen regarding his complaint about pains in his groin on May 28, 1997, and on June 24, 1997. Defendants submit that Dr. Sweeting saw Perkins on August 4, 1997, when Perkins complained of increased inguinal pain in the right part of his groin. Perkins's surgery was finally performed on November 5, 1997.

Plaintiffs' expert, Dr. Greifinger, opines that the delay in Perkins's surgery was not the result of medical considerations, but rather of barriers deliberately erected by CMS to delay or prevent expensive treatment. In his view, Perkins was forced to suffer undue pain and disability for more than one year because of these unjustified barriers.

#### *Vascular Disease*

A pair of support stockings was ordered for Perkins in December of 1997. Perkins alleges that he did not receive the stockings until August of the following year. While he was waiting for the stockings,

---

**32.** An inguinal hernia is an hernia that has turned from the inguinal canal laterally over the groin.

Perkins developed a rash on his legs, a stasis ulcer, and an underlying infection. Perkins claims that he needed to wait eight days for the antibiotic prescribed for his infection. He alleges that the delay in his medication caused his situation to worsen and caused him to be admitted to the infirmary for ten days, during which he was administered antibiotics intravenously.

Defendants point out that Perkins was referred for a support stocking fitting on February 25, 1998. They claim that he refused his stockings on March 12, 1998.

On March 17, 1999, Perkins was ordered a new pair of stockings. Perkins claims the stockings did not arrive until August of that year, and when they arrived, they were the wrong size. He further claims that he was forced to wait another four months until he got a pair of stockings that fit properly. Defendants, however, claim that Perkins received two pairs of support stockings on April 28, 1999.

Between June and August 1997, CMS's staff referred Perkins for a consultation with a vascular surgeon. Perkins alleges that delays in scheduling and in the performance of necessary diagnostic tests resulted in the delay of his appointments. He was not examined by the surgeon until June 24, 1998. Perkins claims that the vascular surgeon asked to see Perkins again within four to six weeks; however, Perkins was not sent back to the surgeon until September 23, 1998.

Perkins complains that he experienced further delays in seeing a vascular surgeon during 2000 and 2001. According to Dr. Greifinger, the delays in treating Perkins's vascular problems increased the risk that Perkins would require the amputation of his leg or foot.

*Rectal Bleeding*

In September 1998, Perkins complained of rectal bleeding. He claims that he did not receive medical attention until November 23, 1998. On December 7, 1998, Perkins was referred to a Dr. Gersten, a gastroenterologist. The specialist decided that Perkins should have a sigmoidoscopy.[33] Perkins claims that the procedure was not performed until December 13, 2000. Defendants, however, have produced documents indicating that Perkins had a sigmoidoscopy on January 27, 1999, the results of which were within the normal range. Defendants claim that the December 2000 sigmoidoscopy was performed after Perkins complained again about bleeding from his rectum on October 12, 2000. This sigmoidoscopy revealed the presence of polyps.

Defendants point out that Perkins was seen by CMS doctors and was referred to specialists with regard to rectal bleeding throughout 2001 and 2002. On January 29, 2002, Perkins received a rectal ultrasound and a biopsy that led to a diagnosis of prostate cancer. Perkins does not complain about the treatment he has received for his prostate cancer.

*Displaced Medical Records*

Like many of the Plaintiffs here, Perkins claims that he suffered delays in medical treatment because CMS constantly misplaced his medical records. Perkins alleges that he was refused appointments with physicians due to missing medical files on August 1 and August 7 of 1996, and on March 12, May 28, and June 30 of 1997. Defendants do not respond to this allegation.

*Perkins's Eighth Amendment Claim*

The Court finds sufficient support to deny Defendants' motion for summary judgment with regard to the treatment of Perkins's hernia. It is undisputed that Perkins suffered disability and severe pain in the year after Dr. Saclolo requested a

**33.** A sigmoidoscopy is an endoscopic examination.

surgical consultation for Perkins's hernia. Defendants point out that after this request was denied by Dr. Parks on October 31, 1996, Perkins was seen by CMS medical staff on multiple occasions, and that he underwent surgery for his hernia on November, 5, 1997. The fact that Perkins was provided with some treatment, however, is not, by itself, enough to preclude his Eighth Amendment claim. *See Generally Durmer v. O'Carroll,* 991 F.2d 64 (discussed in detail above). Dr. Greifinger opines that the delay in surgery was not due to medical reasons. This Court finds the reasons for the delays in Perkins's surgical consultation to constitute an issue of material fact. Thus Perkins's claim is not proper for resolution on a motion for summary judgment.

The Court finds that material issues exist with regard to the treatment of Perkins's vascular disease. The parties dispute when Perkins received medical support stockings and whether Perkins developed deep skin infections and an ulcer due to delays in the supply of such stockings and antibiotics. Plaintiffs' expert opines that the alleged delay in the treatment of Perkins's vascular disease put Perkins's right leg at risk of amputation. The Court finds that a reasonable jury could find that Defendants were deliberately indifferent to Perkins's vascular disease. Thus summary judgment on this claim is not proper.

The Court finds a lack of sufficient support for Perkins's Eighth Amendment claim about the treatment of his rectal bleeding. Specifically, the Court finds that Perkins is unable to show how he was injured by the alleged improper monitoring of this problem.

Finally, the Court finds Perkins's complaint about CMS's constant misplacement or loss of his medical records disturbing. This complaint is shared by many of the Plaintiffs here. If it is true, it provides strong support for Plaintiffs' claims that CMS was indifferent to their well-being.

### 14. *Paul Ratti*

█ Plaintiff Paul Ratti ("Ratti") complains about the treatment he received for a degenerative joint disease in his knee and for his rheumatoid arthritis. Ratti also complains about the treatment of complications he suffered as a result of surgery performed on his Achilles tendon.

#### Rheumatoid Arthritis

On May 1, 1997, Dr. Sweeting examined Ratti for his rheumatoid arthritis. Ratti also complained about decreased range of motion, lesions on the left upper arm, and a degenerative joint disease. Dr. Sweeting prescribed medication and requested that Ratti be referred to an orthopedic clinic. Ratti's medical records show that he was referred to an orthopedist on May 5, 1997; however, the records give no indication as to whether this consultation actually occurred.

Dr. Sweeting saw Ratti again on June 5, 1997. Dr. Sweeting examined Ratti for his degenerative joint disease and psoriasis, prescribed medication and asked to see Ratti again within two weeks. Ratti was referred to an orthopedic clinic for his joint disease on July 10, 1997.

On August 4, 1997, Dr. Sweeting noted a deformity of Ratti's left hand and prescribed Relafen[34] and blood tests. On September 19, 1997, Ratti complained about pain in his right knee, left wrist and right fingers. Ratti was referred to a neurologist. His medical record does not indicate whether he actually saw a neurologist. According to Defendants' submission, on January 16, 1998, Ratti com-

---

**34.** Relafen is an anti-inflammatory medi- cation and pain-reliever.

plained about severe pain and disability in his knee. He was prescribed a rigid knee brace and orthopedic boots. Ratti, however, claims that the knee brace was prescribed to him on December 17, 1997. He alleges that the brace was not ordered until February 23, 1998, and was not delivered to him until July 1998.

On May 12, 1998, Ratti received a knee X-ray which showed moderate degenerative changes. On May 20, 1998, Ratti submitted a complaint alleging that he had still not received the prescribed brace and boots. The next day he was seen and fitted for orthopedic boots. He received his right knee brace, as well as a neoprene under-sleeve, on July 1, 1998.

In August and September of 1998, Ratti complained about recurring knee pain. On January 21, 1999, Dr. William Ryan, a rheumatologist, noted a moderate degree of degenerative arthritis in Ratti's major joints. He prescribed Relafen and ordered that Ratti receive physical therapy for his major joints.

On February 10, 1999, Ratti complained that he had not received the Refalen that was prescribed for him. Sixteen days later, Ratti wrote to EJSP's Administrator, Washington, complaining about the delays in receipt of prescription medication and his failure to receive the physical therapy ordered by Dr. Ryan. Ratti claims that he received no response to this complaint. Ratti's medical records indicate that he had his first physical therapy consultation on February 10, 1999.

Ratti was transferred from EJSP to New Jersey State Prison in Trenton on March 24, 1999. He was in physical therapy throughout July, August, and September of 1999. He claims that he needed to submit multiple requests in order to continue the physical therapy, and that he suffered continuous delays in scheduling his appointments.

### Achilles Tendon Condition

Ratti suffered from post-surgical complications from the repair of his right Achilles tendon in the early 1980s.[35] On or about February 26, 1996, Ratti had surgery to remove cysts from his injured Achilles tendon. On September 16, 1996, he consulted with an orthopedist, Dr. Capotosta, because of the recurrence of a cyst on his Achilles tendon. Defendant Dr. Neal prepared and approved a surgical consult on September 23, 1996. Ratti testified that in December of 1996, he wrote to an EJSP Administrator to inquire when he would have the prescribed surgery.

On January 29, 1997, Dr. Parks noted chronic drainage and multiple abscesses in Ratti's Achilles tendon. On February 18, 1997, Ratti was seen for a surgical consult. Dr. Salloum, who examined Ratti, found ganglion[36] Achilles tendon cysts and asked that Ratti be seen by Dr. Capotosta. By March 1997, Ratti had received four separate surgical consultations and four requests from the consultants for treatment of the cysts on his right Achilles tendon.

On November 24, 1997, Dr. Wisler, an outside consultant and surgeon, examined Ratti. Dr. Wisler noted that Ratti was suffering from a painful nodule on his right ankle posteriorily and recommended excision of the cyst. This procedure was performed on December 12, 1997. Ratti does not complain about the treatment he received after this procedure. He claims

---

**35.** Ratti complains about a series of alleged failures in treatment that occurred between his surgery and 1996. The Court does not address these allegations because they refer to a period that predates the CMS–DOC contract.

**36.** A ganglion is a benign cyst occurring on a tendon and consists of a thin fibrous capsule enclosing a clear mucinous fluid.

that the delays in performing the surgery caused him unnecessary pain and hardship.

*Ratti's Eighth Amendment Claim*

Sufficient evidence exists for Ratti's Eighth Amendment claim, about the treatment of his rheumatoid arthritis, to survive Defendants' motion for summary judgment. The evidence submitted by both parties indicates that Ratti suffered significant pain and disability in his right knee. A genuine issue of material fact exists with regard to an alleged delay in providing Ratti with a prescribed knee brace to alleviate his suffering. Ratti claims that the brace was prescribed on December 17, 1997, that it was not ordered until February 23, 1998, and that it was not delivered to him until July 1998. A reasonable jury could find that Defendants were deliberately indifferent to Ratti's pain and disability when they caused him to wait eight months for the prescribed knee brace. *Spruill,* 372 F.3d at 235 (discussed in detail above); *Taylor v. Plousis,* 101 F.Supp.2d 255 (D.N.J.2000) (detainee's deteriorating prosthesis which caused him pain and mobility problems was found to be a serious medical need); *Kaufman v. Carter,* 952 F.Supp. 520, 527 (W.D.Mich. 1996) ("A medical condition that threatens one's ability to walk, even if ultimately reversible, is unquestionably a serious matter.")

The Court does not find sufficient evidence to support Ratti's Eighth Amendment claim with regard to the treatment of complications arising from surgery on his Achilles tendon. Ratti's medical records indicate that Ratti was seen by CMS physicians and outside specialists about the problems in his Achilles tendon on numerous occasions. The records also indicate that the treatment for Ratti's Achilles tendon problems was prescribed by outside surgeons and rheumatologists, and that when surgery was recommended at the end of 1997, it was performed within three weeks. It is important to note that Ratti is not suing the outside consultants who treated his Achilles tendon. Ratti's dissatisfaction with the treatment he received does not provide sufficient evidence to survive a motion for summary judgment. *Id.*

### 15. *Isa Saalahudin*

■ Plaintiff Isa Saalahudin ("Saalahudin") was transferred to EJSP from Trenton State Prison in April 1993 and was at EJSP during all relevant times. Saalahudin's main complaint is that he suffered excessive delays in access to medical treatment with regard to a nasal tumor, an abnormal X-ray and foot problems.

*Nasal Tumor and Headaches*

On September 12, 1997, Saalahudin was seen by Dr. Rossos, an ENT specialist, regarding a growth in Saalahuddin's right nasal cavity. Dr. Rossos requested that an operation to remove the tumor be authorized as soon as possible. This surgery was performed on November 12, 1997. Defendants point out that the growth removed was benign and that Saalahudin provided no medical authority for his claim that the gap of approximately 75 days from the initial consult to the operation constitutes an excessive delay.

On September 18, 1998, Dr. Sweeting submitted a request for an ENT consultation for Saalahudin, who complained about persistent pains in the right side of his head. The request was approved by Dr. Neal on October 27, 1998. Saalahudin asserts that the 39–day delay from the consultation request to the appointment was excessive. He points out that Defendants' medical expert, Dr. Paris, recommended a seven to ten day time frame.

The requested consultation was conducted by Dr. Rossos on November 20, 1998. Dr. Rossos prescribed Saalahudin a nasal

spray and requested that Saalahudin be evaluated by a neurologist. Saalahudin claims that he needed to wait close to one month for his nasal drops. He also claims that his neurology consultation was not approved until April of 1998. Dr. Woodward, the neurologist who examined Saalahudin, requested a CT scan. Dr. Sweeting completed the CT scan request on May 4, 1999. Saalahudin alleges that it took 41 days for this request to be approved.

The CT scan was scheduled for July 7, 1999, but Saalahudin refused the procedure. The CT scan was rescheduled for August 6, 1999, but was cancelled again, this time due to miscommunication among EJSP staff. The CT scan was finally performed on August 11, 1999. The physician that read Saalahudin's CT scan found it to be unremarkable. The CT scan indicated the presence of a non-threatening cyst or a polyp.

### Abnormal Chest X–Rays

Dr. Delphia Clark evaluated an X-ray of Saalahudin's chest, taken on October 28, 1999. The X-ray indicated the presence of "diffuse articular nodular infiltrate." Defs.' Ex. D–Saalahudin at 289. Dr. Clark noted that such a finding may reflect the presence of a metastatic disease and recommended "follow-up chest films and/or chest CT, if clinically indicated." *Id.* Dr. Parks reviewed Dr. Clark's report on November 2, 1999. On November 18, 1999, Dr. Reddy submitted a consultation request and recommended a CT scan. Dr. Reddy noted Dr. Clark's recommendation and Saalahudin's childhood history of tuberculosis. Dr. Parks approved the CT scan on December 1, 1999. The CT scan, which was performed on December 22, 1999, showed that Saalahudin was not suffering from metastatic disease or tuberculosis. Dr. Parks reviewed the CT scan report on January 1, 2000. Plaintiffs' medical expert, Dr. Greifinger, opines that the delay in examining Saalahudin's poten-

tial tuberculosis created a public health risk to the staff and the inmates at EJSP.

### Foot Problems

Saalahudin alleges he has suffered multiple deformities of both feet and has needed orthopedic footwear for most of his life. He claims that special orthopedic boots were regularly provided to him by Trenton State Prison until the end of 1998.

On October 15, 1998, Dr. Sweeting requested that Saalahudin's foot condition be evaluated, noting that Saalahudin was last fitted with orthopedic boots in December of 1997. Dr. Parks denied this request, finding that it was "not clinically indicated." Defs.' Ex. D–Saalahudin at 164. On December 14, 1998, Dr. Boostaver, a primary-care physician, submitted a consultation request indicating that Saalahudin needed new orthopedic boots. Dr. Parks denied the request, finding no evidence that it was clinically needed. On July 13, 1999, Dr. Wisler, an orthopedist, recommended that Saalahudin be fitted for a wide width boot with an enforced shank. Dr. Parks approved this recommendation on July 19, 1999.

In his deposition, Saalahudin stated that the change from orthopedic boots to wide width boots caused him to experience sharp pain in his bones. Plaintiffs' medical expert, Dr. Greifinger, who reviewed Saalahudin's case, did not comment on the treatment of Saalahudin's foot problems.

### Saalahudin's Eighth Amendment Claim

Saalahdin lacks sufficient support for his Eighth Amendment claim with regard to the treatment of his nasal tumor and headaches. To establish an Eighth Amendment claim, an inmate must show a serious medical need that has been ignored by prison authorities. *Natale*, 318 F.3d at 582. Saalahudin does not demonstrate that he suffered from a serious medical condition that Defendants ignored. His medical records show that he was prompt-

ly seen by CMS physicians, an outside ENT specialist, and a neurologist. The record also shows that a CT scan provided to Saalahudin on August 11, 1999 revealed only the presence of a non-threatening cyst or polyp. Because there is no showing that a serious medical need existed, summary judgment for Defendants is proper on this claim.

Similarly, the Court finds Saalahudin's Eighth Amendment claim with regard to his abnormal X-ray without merit. The X-ray from October 28, 1999 indicated the possibility of pneumonia or metastatic disease. It is uncontested, however, that subsequent clinical testing and a CT scan ruled out this hypothetical diagnosis. Thus, because Saalahudin suffered no serious medical need, summary judgment for Defendants is proper on this claim. *Id.*

Finally, the Court rejects Saalahudin's Eighth Amendment claim about the treatment of his foot problems. Saalahudin complains that the change from orthopedic boots to wide width boots caused him pain in his bones, but he does not contest the fact that this change was made pursuant to an orthopedist's recommendation. Saalahudin complains that Dr. Parks denied consultations requested by primary-care physicians in his behalf, but Saalahudin provides no medical authority that challenge Dr. Park's decisions. In fact, Dr. Greifinger made no comments about the treatment of Saalahudin's foot problems at all. Summary judgment is proper on this claim.

## III. DISMISSAL OF PLAINTIFFS' PRIVACY CLAIMS

Plaintiffs' privacy claims lack merit. Plaintiffs allege that their constitutional rights to privacy were violated by Defendants' failure to file the summary judgment motions, which include excerpts from Plaintiffs' medical records, under seal. Plaintiffs fail to cite any authority to support this claim. Further, while Plaintiffs' answer to Defendants' motions was filed under seal, their initial complaints, which described their medical conditions at great length, were not filed under seal.

Two Plaintiffs, Drinkard and Howard, also allege that their rights to privacy were violated in the prison setting. Drinkard testified that his medical file bore the marking "HIV" in red on the outside cover, adjacent to his name and inmate number. He contends that several inmates learned of his HIV status after viewing the outside of his file. Drinkard also alleges that other inmates learned about his HIV status because he was treated by a physician known in ESJP as the physician who treats infectious diseases. Howard testified that other inmates were able to infer his HIV status from viewing his HIV medication labels. The allegations of both Drinkard and Howard are not supported by corroborative evidence. Their mere beliefs that inmates learned about their HIV status in the ways they describe are not sufficient to survive a motion for summary judgment. *Quiroga*, 934 F.2d at 500.

## IV. DISMISSAL OF THE PENDANT STATE LAW CLAIMS IN THE ACTIONS WHERE SUMMARY JUDGMENT WAS GRANTED ON THE CONSTITUTIONAL CLAIMS

Given that Defendants were granted summary judgment on the constitutional claims of Plaintiffs Drinkard, Griggs, Hanna, Howard, Izquierdo, Kahliq, Lewis, Musto and Saalahudin, this Court declines to exercise supplemental jurisdiction on the pendent state law claims of these Plaintiffs.

Pursuant to 28 U.S.C. 1367(C)(3), this Court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." This Court has no original jurisdiction over Plaintiffs' state law tort claims.

Plaintiffs "knowingly risked dismissal of [their] claims when they filed suit in federal district court and invoked the Court's discretionary supplemental jurisdiction power." *Annulli v. Panikkar*, 200 F.3d 189 (3d Cir.1999). The pendent state law claims of Drinkard, Griggs, Hanna, Howard, Izquierdo, Kahliq, Lewis, Musto and Saalahudin, are dismissed without prejudice. Thus, these Plaintiffs are free to pursue their state law claims in state court.

## V. THE LIABILITY OF CMS AND THE CMS DEFENDANTS

### a. Direct Liability in § 1983 Claims

■ It is uncontested that CMS is being sued in its capacity as a corporation that operates under color of New Jersey law. Thus, CMS cannot be held liable for the acts of its employees and agents under the theories of respondeat superior or vicarious liability.[37] *Natale*, 318 F.3d at 583; *Monell v. Dep't Of Soc. Serv. of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to establish that CMS and the CMS Defendants are directly liable for the alleged Eighth Amendment violations perpetrated by their agents, Plaintiffs "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] they allege." *Natale*, 318 F.3d at 584.

■ According to the Third Circuit, "[n]ot all state action rises to the level of custom or policy." *Id.* "A policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Id.* (internal cita-

tions omitted). "Custom" is defined as "an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law'." *Id.* (quoting *Bd. of Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

■ The Third Circuit has identified three situations in which it will consider acts of government employees, or employees of a private entity acting under color of state law, to result from a government policy or custom. *Natale*, 318 F.3d at 584. In these situations, the government will be held directly liable under § 1983. The three situations leading to direct government liability are:

"[1] appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy ... [2] no rule has been announced as policy but federal law has been violated by an act of the policymaker itself ... [3] *policymaker has failed to act affirmatively* at all, though *the need to take some action to control the agents of the government is so obvious,* and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."

*Id.* (internal citation omitted) (emphasis added).

### b. Application of the Direct Liability Standard to Plaintiffs' Actions [38]

■ In their brief and at the summary judgment hearing, Plaintiffs provided this

---

**37.** "Respondeat superior and vicarious liability are the theories under which courts 'impose liability vicariously ... solely on the basis of the evidence of an employer-employee relationship with a tortfeasor'." *Natale,*

318 F.3d at 584 (quoting *Monell,* 436 U.S. at 692, 98 S.Ct. 2018).

**38.** This analysis only applies to the claims that survive Defendants' motion for summary judgment.

Court with numerous documents describing CMS's alleged failure to provide EJSP inmates with proper medical care at times relevant to this action.[39] Most of these documents were either written by the CMS Defendants, addressed to them, or forwarded to them. *See* Pls.' Ex. 3, 9–10, 20–21, 23–25, 35, 42–44, 46–51. Generally, these documents show the serious ongoing concern and dissatisfaction of DOC officials with CMS's handling of the medical care in EJSP. Issues repeatedly discussed in these documents include: (1) CMS's failure to promptly provide inmates with vital medications, (2) the inmates' difficulty in obtaining appointments with primary physicians, (3) the inmates' difficulty in obtaining referrals to specialists, and (4) CMS's failure to adequately maintain inmates' medical records.

Plaintiffs' medical expert, Dr. Greifinger, opines that all the CMS Defendants were aware, or should have been aware, of the problems discussed in the documents described above. Pls.' Ex. 39–40. In his report and deposition, Dr. Greifinger stated that the inadequate medical care provided to Plaintiffs resulted directly from CMS's inability, or unwillingness, to promptly address the concerns raised by DOC officials. Pls.' Ex. 1, 39–40. Generally, Dr. Greifinger finds the processes and procedures that CMS used to provide medical care in EJSP to be chaotic and overly-bureaucratic. Pls.' Ex. 1 at 6. He opines that CMS failed to properly maintain EJSP inmates' medical records, and to monitor their serious medical needs. *Id.* He further opines that in order to reduce costs and increase profits, CMS created artificial administrative barriers, which prevented inmates from getting the medical care they needed. *Id.*

All Plaintiffs before this Court filed grievances about their inability to promptly receive medication and/or see physi-

cians. Most of these Plaintiffs wrote several letters of complaint to DOC and CMS officials about the problems they encountered in their attempts to obtain medical care. They all maintain that their injuries were caused by at least one of the deficiencies of which CMS was well aware and which CMS failed to affirmatively address.

Specifically, Plaintiffs Cancio, Castellano, Jackson and Perkins claim that a driving force behind their injuries was CMS's alleged failure to maintain their medical records. All the Plaintiffs whose claims survive summary judgment complain about delays in receiving medication, medical testing and treatment, as well as difficulties and delays in seeing primary-care physicians and specialists.

This Court holds that a reasonable jury could find that Defendants were aware of the grave deficiencies in the medical care provided to Plaintiffs Cancio, Castellano, Jackson, Muhammad, Perkins and Ratti, as well as the acute risks created by these deficiencies. A reasonable jury could also find that the failure of CMS and the CMS Defendants to take affirmative action to address these risks "is sufficiently obvious as to constitute deliberate indifference to [these] inmates' medical needs." *Natale*, 318 F.3d at 585.

## VI. *PUNITIVE DAMAGES*

CMS asks this Court to decide, on a motion for summary judgment, that punitive damages are not applicable to Plaintiffs' actions. The Court finds that such a request is premature and will not decide this issue.

The Third Circuit has found that "a jury [may] assess punitive damages under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or cal-

---

**39.** *See* the General Material Facts section for a discussion of some of these documents.

lous indifference to the federally protected rights of others." *Brennan v. Norton,* 350 F.3d 399, 428 (3d Cir.2003) (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). The Third Circuit also has held that a plaintiff who seeks punitive damages in a § 1983 action must show that the defendant's conduct was "at a minimum, reckless or callous," and that "[p]unitive damages might also be allowed if [defendant's] conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard." *Brennan,* 350 F.3d at 428–429.

This Court has held that a reasonable jury could conclude that Defendants were deliberately indifferent to the serious medical needs of Cancio, Castellano, Jackson, Muhammad, Perkins and Ratti. If the jury finds that Defendants indeed violated these plaintiffs' Eighth Amendment rights, the Court may conclude that punitive damages are warranted. In conclusion, the Court reserves its right to rule on the issue of punitive damages in a later stage of this litigation.

## VII. *PLAINTIFFS' STATE LAW CLAIMS*

### a. *The Quality, Reliability and Sufficiency of Plaintiffs' Medical Expert Report*

■ All Plaintiffs brought state law medical malpractice/negligence claims against Dr. Parks, Dr. Neal and CMS. To establish a *prima facie* case of negligence in a medical malpractice action, a plaintiff must present expert testimony establishing: (1) an applicable standard of care, (2) a deviation from this standard of care, (3) injury, and (4) proximate causation between the breach and the injury. *Teilhaber v. Greene,* 320 N.J.Super. 453, 465, 727 A.2d 518 (App.Div.1999). Defendants argue that the medical report that was produced by Plaintiffs' medical expert, Dr.

Greifinger, fails to identify applicable standards of care or deviations from those standards that allegedly injured Plaintiffs. Defendants also argue that Dr. Greifinger lacks the requisite training and knowledge to testify on many of the medical issues upon which he opined in his report and deposition. The Court disagrees.

A review of Dr. Greifinger's report shows that it refers not only to nationally accepted standards in medicine and correctional medicine, but also to the very standards that were created and declared by CMS. Pls.' Ex. 1. The report analyzes the alleged injuries of each plaintiff and provides Dr. Greifinger's opinion with regard to the alleged breach of duty that caused each plaintiff's injuries. *Id.* at 1–20.

While this Court acknowledges that Dr. Greifinger is not a specialist in many of the medical fields that he addresses in his report, it also recognizes that requiring indigent inmates with complaints about substandard medical treatment to obtain specialists in every applicable medical field is unreasonably burdensome. As a highly regarded expert in the field of correctional medicine, Dr. Greifinger is sufficiently competent to provide expert testimony regarding Plaintiffs' claims. He served as chief medical officer of the New York State Department of Corrections for six years. He was Vice President for Health Care Systems at Montefiore Medical Center in New York City. He is presently a consultant on the design, management and operation of managed healthcare organizations and correctional healthcare systems. Courts, state governments and the United States Department of Justice have used Dr. Greifinger's services in designing, evaluating and monitoring healthcare systems in correctional facilities. Dr. Greifinger has published articles on various issues in correctional medicine, including the treatment of HIV/AIDS and other infectious

diseases in correctional settings, and has facilitated academic and professional panels on these issues. Considering Dr. Greifinger's extensive and impressive experience in correctional medicine, this Court finds his report to be sufficiently reliable to support Plaintiffs' medical malpractice/negligence claims.

### b. *The Individual Medical Malpractice/Negligence Claims*

### 1. *Cancio's Medical Malpractice/Negligence Claim*

■ Dr. Greifinger opines that the delay in the diagnosis of Cancio's metastasized prostate cancer resulted from CMS's failure to maintain Cancio's medical records properly and from CMS's failure to provide Cancio's treating doctor with critical PSA and bone scan test results. Dr. Greifinger maintains that CMS failed to provide Cancio's radiation oncologist with requested PSA results, and that it is very difficult to diagnose metastasis without PSA and bone scan test results. Summary judgment is improper because a reasonable jury could conclude that CMA's failure to provide the radiation oncologist with critical test results constituted negligence by CMS personnel.

■ The Court rejects Cancio's medical malpractice/negligence claims with regard to the treatment he received for his other illnesses. Most of Cancio's complaints about the treatment of his chronic obstructive pulmonary disease ("COPD") pertain to actions that were taken prior to the CMS–DOC contract. While Cancio provides several examples in which CMS actions with regard his COPD and kidney problems might have been negligent, Cancio does not demonstrate how he was injured by these potentially negligent actions. As noted above, a negligence claim cannot stand without a demonstration of injury. *Teilhaber*, 320 N.J.Super. at 465, 727 A.2d 518.

Finally, as noted before, the mere fact that Cancio's medical records do not document the treatment of his gout is insufficient for a reasonable jury to find that Cancio's gout was not treated. Further, Cancio also fails to show how the alleged lack of treatment injured him.

### 2. *Castellano's Medical Malpractice/Negligence Claim*

■ Dr. Greifinger opines that CMS failed to properly monitor and control the level of sugar in Castellano's blood, and that this failure resulted in irreversible damage to Castellano's heart and kidneys. A reasonable jury could infer that CMS personnel were negligent in the treatment of Castellano's diabetes, and that this negligence seriously injured Castellano. Summary judgment is therefore denied.

The Court rejects Castellano's medical malpractice claims with regard to the treatment of his cardiac problems, and his alleged exposure to unsanitary conditions. As noted above, Castellano fails to show how he was injured by the allegedly improper care that he received for his cardiac problems. Castellano also fails to demonstrate how his alleged exposure to unsanitary conditions affected his medical condition. Therefore, summary judgment is proper.

### 3. *Jackson's Medical Malpractice/Negligence Claim*

Dr. Greifinger opines that CMS's alleged failure to provide Jackson with his HIV medication in a timely manner probably contributed to the development of his Hodgkin's disease. Dr. Greifinger also opines that lack of medical care probably led to other documented complications like pneumonia and a general deterioration of Jackson's immune system. A reasonable jury could find that Jackson was injured by CMS personnel negligence in adminis-

tering Jackson's HIV/AIDS medication. Consequently, summary judgment is not proper.

#### 4. *Muhammad's Medical Malpractice/Negligence Claim*

Dr. Greifinger opines that CMS's failure to adequately monitor Muhammad's heart condition, and to consistently provide him with medication for his blood pressure, put Muhammad's life in danger. The Court holds that a reasonable jury could find that CMS personnel were negligent in treating Muhammad's heart condition and high blood pressure.

Dr. Greifinger does not opine that CMS's alleged inadequate treatment of Muhammad's arm and neck problems caused Muhammad any lasting injury. Thus, summary judgment is proper with regard to these issues.

Summary judgment is also proper with regard to Muhammad's medical malpractice/negligence claim about the treatment of his ear infections. As noted above, Muhammad fails to show that CMS officials refused or failed to refer him to ENT consultations when such consultations were needed. Muhammad neither shows how the treatment of his ear infections deviated from recognized medical standards, nor shows how CMS's alleged mistreatment injured him in any way.

Finally, Muhammad fails to show that he suffered an injury as a result of allegedly improper medical treatment of his ingrown toe-nail and allergies. Consequently, summary judgment is proper with regard to these claims.

#### 5. *Perkins's Medical Malpractice/Negligence Claims*

Dr. Greifinger opines that the alleged delays in the treatment of Perkins's vascular disease put Perkins's right leg at risk of amputation. The Court holds that a reasonable jury could find that CMS personnel were negligent in failing to treat Perkins's vascular disease adequately, and that this negligence damaged Perkins's leg and cause him unnecessary pain and disability. Therefore, summary judgement is not proper.

According to Dr. Greifinger, adequate treatment of Perkins's hernia was unnecessarily delayed. Perkins undisputably suffered disability and severe pain during this allegedly excessive wait for surgery. A reasonable jury could therefore conclude that Defendants were negligent in failing to provide Perkins with treatment in a timely manner. Summary judgment as to this issue is therefore improper.

Summary judgment is proper with regard to the treatment of Perkins's rectal bleeding. As noted above, Perkins fails to show how CMS's alleged failure to monitor his rectal bleedings injured him.

#### 6. *Ratti's Medical Malpractice/Negligence Claim*

Dr. Greifinger opines that Ratti suffered unnecessary pain and disability in his right knee because of CMS's alleged failure to provide Ratti with a knee brace that was prescribed for him. Summary judgment is not proper because a reasonable jury could conclude that CMS's alleged failure to provide Ratti with his prescribed knee brace in a timely manner constituted negligence.

The Court does not find sufficient evidence to support Ratti's medical malpractice/negligence claim with regard to the treatment of his Achilles tendon problems. As noted before, the treatments for these problems were prescribed by outside surgeons and rheumatologists who are not defendants in this action. Ratti's medical records indicate that Ratti was continually referred to specialists for his Achilles tendon problems, and there is no indication that CMS refused to address these issues. Ratti's personal dissatisfaction with the

treatment he received is not sufficient evidence to survive a motion for summary judgment.

### c. *Affidavit of Merit Requirement*

■ Defendants argue that Plaintiffs' medical malpractice claims are barred because Plaintiffs failed to serve them with an affidavit of merit as required by N.J.S.A. 2A:53A–27 (the "Affidavit of Merit Statute"). This Court disagrees because it finds that Plaintiffs' medical malpractice claims fall within the "common knowledge exception" to the Affidavit of Merit Statute. *Natale*, 318 F.3d at 580. *See also Hubbard v. Reed*, 168 N.J. 387, 395–396, 774 A.2d 495, 499–500 (2001); *Palanque v. Lambert–Woolley*, 168 N.J. 398, 404–408, 774 A.2d 501, 505–507 (2001).

The affidavit of merit statute was enacted as part of a legislative scheme "designed to strike a fair balance between preserving a person's right to sue and controlling nuisance suits." *Palanque*, 774 A.2d at 505 (internal citations omitted). The statute provides that a plaintiff in a malpractice action "must show that the complaint is meritorious by obtaining an affidavit from an appropriate, licensed expert attesting to the reasonable probability of professional negligence." *Ferreira v. Rancocas Orthopedic Assocs.*, 178 N.J. 144, 149–150, 836 A.2d 779, 782 (2003). Absent extraordinary circumstances, "the affidavit must be provided to the defendant within sixty days of the filing of the answer or, for cause shown, within an additional sixty-day period." *Id.* Plaintiff's failure to comply with these requirements "is considered tantamount to the failure to state a cause of action, subjecting the complaint to dismissal with prejudice." *Id.*; N.J.S.A. 2A:53A–29.

■ The common knowledge exception to the affidavit of merit statute applies in cases where "the threshold of merit should be readily apparent from a reading of the plaintiff's complaint." *Hubbard*, 168 N.J. at 395, 774 A.2d 495, and where "an expert is no more qualified to attest to the merits of a plaintiff's claim than a non-expert." *Id.*

It is undisputed that Plaintiffs failed to serve Defendants with an affidavit of merit. As described below, however, the improper actions about which Plaintiffs complain in their surviving state law claims fall within the common knowledge exception to the Affidavit of Merit Statute.

Cancio complains about CMS's alleged failure to provide his radiation oncologist in a timely manner with critical test results that his specialist specifically requested. Castellano complains about the failure by CMS personnel to timely provide him with diabetes medication and control his blood-sugar levels. Jackson complains about CMS's continuous failure to provide him prescribed HIV/AIDS medication. Muhammad complains about CMS's failure to provide him prescribed blood pressure medication. Perkins complains about CMS's failure to provide him with support stockings prescribed for him, and about the length of time that it took CMS to approve the hernia surgery that his physician requested. Finally, Ratti complains about an allegedly inexcusable and excessive delay in providing him with a knee brace that was prescribed for him.

A reasonable jury would not need the assistance of an expert to conclude that CMS personnel were negligent when they allegedly failed both to provide these plaintiffs with medical care prescribed for them by their treating specialists and to follow the medical instructions of these specialists. "Common sense—the judgment imparted by human experience—would tell a layperson that medical personnel charged with caring" for an inmate with a serious medical need should provide this inmate his prescribed treatment in a timely fash-

ion. *Natale*, 318 F.3d at 580. Thus, the common knowledge exception to the Affidavit of Merit Statute applies to these Plaintiffs' claims.

The main goal behind the Affidavit of Merit Statute is "weeding out frivolous lawsuits early in the process." *Ferreira*, 836 A.2d at 780. Plaintiffs' lawsuits are no longer "early in the process," considering the extensive discovery that has been conducted by both parties over the past three years. Further, Plaintiffs have already served this Court with a report by their medical expert that supports their claims. Because this Court has found that the relevant medical malpractice/negligence claims are strong enough to survive motions for summary judgment, it appears that the legislative intent has been satisfied.

d. *Vicarious Liability under State Law*

 In the summary judgment hearing, CMS claimed that it cannot be held vicariously liable for Plaintiffs' state law claims that are based on the allegedly improper actions of independent contractors. The Court does not agree. In a recent case, the New Jersey Appellate Division held that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody..." *Scott–Neal v. N.J. State Dept. of Corr.*, 366 N.J.Super. 570, 575, 841 A.2d 957, 960 (App.Div.2004) (citing *West v. Atkins*, 487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). The Appellate Division described the liability status in cases were the state is "contracting out prison medical care" as "an exception to the general rule that one who hires an independent contractor is not liable for the negligence of that contractor." *Id.* The Appellate Division further provided that:

> It is the physician's function within the state system, not the precise terms of his employment, that determines wheth-

er his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner.

*Id.*

The parties agree that CMS and the CMS Defendants were acting under color of state law when they provided medical care to Plaintiffs. CMS essentially stepped into shoes of the DOC and assumed full responsibility for the medical department of EJSP. Therefore, the use of independent contractors does not relieve CMS or the DOC of their duty to provide adequate medical care to EJSP inmates. *Id.* In conclusion, while vicarious liability does not apply to Plaintiffs' Eighth Amendment claims against CMS, it does apply to their state law claims against CMS and the DOC.

## VIII. *CONCLUSION*

For the reasons discussed above, Defendants' motions for summary judgment are **granted** with regard to Plaintiffs Eugene Drinkard, Walter Griggs, Dennis Hanna, John Howard, Geraldo Izquierdo, Abdul Kahliq, Derrick Lewis, Thomas Musto and Isa Saalahudin. The pendent state law claims of these plaintiffs are **dismissed without prejudice.**

Defendants' motions for summary judgment with regard to Plaintiffs Gustavo Cancio, Stephen Castellano, Randolph Jackson, Mufeed Muhammad, Jerome Perkins and Paul Ratti are **granted in part** and **denied in part.**

An appropriate order follows.

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by

defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Eugene Drinkard's** ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### ORDER

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff

**Walter Griggs's** ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### ORDER

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Dennis Hanna's** ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **John Howard**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Geraldo Izquierdo**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### *ORDER*

This matter having come before the Court on the motion for summary judg-

ment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Abdul Khaliq**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Derrick Lewis**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Thomas Musto**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### ORDER

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Isa Saalahudin**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claims is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Plaintiff's pendant state law claims are **dismissed without prejudice.**

### ORDER

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Gustavo Cancio**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his prostate cancer is **denied**; and

Defendant's motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his chronic obstructive pulmonary disease and kidney problems is **granted**.

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his prostate cancer is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his chronic obstructive pulmonary disease and kidney problems is **granted.**

### ORDER

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Stephen Castellano**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his diabetes is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his cardiac problems and for treatment under unsanitary conditions is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his diabetes is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his cardiac problems and for treatment under unsanitary conditions is **granted**.

### ORDER

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Randolph Jackson**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim is **denied**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim is **denied**.

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Mufeed Muhammad**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his back pain, neck-nerve damage, and numbness in his hand is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his high blood pressure and cardiac problems is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his ingrown toe-nail, allergies, and ear infection is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his heart condition and high blood pressure is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his back pain, neck-nerve damage, and numbness in his hand is **granted**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim about the treatment of his ingrown toe-nail, allergies, and ear infection is **granted**.

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Jerome Perkins**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his hernia and vascular disease is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his rectal bleeding is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his hernia and vascular disease is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of his rectal bleeding is **granted**.

### *ORDER*

This matter having come before the Court on the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants: Correctional Medical Services Inc., and its officials and employees, Carol Holt, Bertha Robinson, James Neal, and Trevor Parks; and joined by defendants: Department of Corrections of the State of New Jersey, and its officials and employees, Defendant William H. Fauver, Howard L. Beyer, Steven Pinchak, Terry Moore, Ronald Cathel, and Richard Switaj ("Defendants") to dismiss claim in plaintiff **Paul Ratti**'s ("Plaintiff") Complaint; and

The Court having considered the submissions of the parties and the entire record before it; and

The Court having heard oral argument on this matter on July 28, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 27th day of September, 2004, hereby ORDERED that Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of his rheumatoid arthritis is **denied**; and

Defendants' motion for summary judgment with regard to Plaintiff's Eighth Amendment claim for the treatment of complications from surgery on his Achilles tendon is **granted**; and

Defendants' motion for summary judgment on Plaintiff's violation of privacy claim is **granted**; and

Defendants' motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of rheumatoid arthritis is **denied**; and

Defendant's motion for summary judgment with regard to Plaintiff's pendant state law claim for the treatment of complications from surgery on his Achilles tendon is **granted**.